## CASE AND WIFE *v.* ABEEL, EXECUTOR, &c.

A surviving partner has the legal right to the partnership effects.

But in equity he is considered merely as a trustee to pay the partnership debts, and to dispose of the partnership property for the benefit of himself and the estate of the deceased partner.

He cannot derive any exclusive profit from the use of the partnership funds.

An executor or trustee cannot purchase the trust property from his co-executor or trustee without being liable for the profits arising from the property purchased.

It is the duty of executors and trustees to keep the trust fund separate and distinct from their private funds.

If they use the trust funds or mix them with their private funds, they will be made liable for all losses which may arise from their neglect or mismanagement.

THE defendant, Garret Abeel, and his brother John, were partners in the hardware business in the city of New York, for several years previous to the death of the latter, which took place in the spring of 1811. About two years before the death of John, he made his will, and thereby adopted his niece, now the wife of R. D. Weeks, and Mrs. Case, one of the plaintiffs, and two children of Phebe Howell, as his children; and devised and bequeathed unto them in equal shares, all his estate, real and personal, with some few exceptions. There was a limitation over of the

share of either who should die without issue, to the survivor or survivors; and with remainder over to the nephews and nieces of the testator, if all his adopted children should die without issue. He also gave to Phebe Howell an annuity of $100, during the pleasure of *his executors, or the survivor of them, with authority to the executors to increase the yearly allowance to her, in their discretion. After giving a few other specific and pecuniary legacies, the testator directed his executors to convert his personal estate into money, and with the proceeds thereof to purchase $3,000 of stocks, and put out the residue at interest, on bond and mortgage, upon real security. They were further directed to pay the pecuniary legacies and the annuity to Phebe Howell, and maintain and educate the adopted children out of the interest; and to pay them their respective proportions as they severally came to the age of twenty-one years. In the meantime he directed the real and personal estate to be vested in the executors, or the survivor of them, for the purposes of the will; and gave them five per cent. on the income of the estate, for their care and trouble in the management thereof. By a codicil, made in 1810, reciting that Phebe Howell was then pregnant, the testator directed the executors to maintain and educate the child out of the estate, in the same manner as the other children adopted by him in his will, and pay it $500 out of his estate as a portion, if it should live to the full age of twenty-one years. The child was born in due course, and is John H. Abeel, one of the defendants in this suit. The niece, Mrs. Weeks, was of age on the 28th of May, 1823, and Mrs. Case, on the 28th of December, 1826. The testator died on his passage from Rio Janeiro, and the news of his death was received in New York about the first of July, 1811. Whereupon Garret B. Abeel proved the will, and shortly afterwards the other executor also obtained probate thereof; but the latter never intermeddled with the estate except to settle the partnership transactions with his co-executor. He died pending this suit: no part of the

1829.

Case
v.
Abeel.

[*395]

estate came to his hands, and nothing was claimed against him.

In February, 1827, the plaintiffs filed their bill in this cause, for an account and settlement of the estate, in which they charged that the acting executor continued to trade with the partnership funds, and made large profits therewith; that he did not put out the moneys at interest as directed by the will, but kept the same in his own hands, except very small portions *thereof, for the purposes of trade; and loaned out other sums to his friends and connections at low rates of interest, and neglected to collect the interest and re-invest the same, &c.

The defendant, Garret B. Abeel, in his answer, admitted that he continued to trade with the partnership stock in trade, and made a profit by its rise in value. But alleged that by the advice of counsel, he took an inventory of the partnership stock, as it existed on the first of July, 1811, when the partnership was published as dissolved; that it was submitted to several respectable merchants and dealers in hardware and iron mongery, who examined the inventory, and estimated the value of the articles; that they decided that 33 1-3 per cent. should be added to the cost of such articles as were charged at sterling prices, and those articles which were charged at currency prices should be estimated at the prices at which they were charged, as their fair value. That such valuation was adopted by him and his co-executor as the fair and just value of the articles; that it was expressly agreed, or clearly understood between them, that he should retain the whole of the stock at that valuation. That the estate of John Abeel was thereupon, on the first of July, 1811, credited by him with one-half the amount at which it was valued, after deducting the balance due to Garret B. Abeel on account of his stock in trade at the time he took John into co-partnership, with interest thereon. And that the stock in trade was not sold at auction because the executors, under the advice of counsel, did not conceive it necessary; and because he was will-

ing to take it at its full value, and to allow more for it than any other person would do. He admitted the receipt of the rents and profits of the real estate of the testator, and that he received several sums on the sale thereof under proceedings in partition; but denied that he had kept money in his hands to answer the exigencies of his business, or that the moneys were not put out for the best rates of interest that could be obtained. That he had kept an interest account from the first of July, 1811, and allowed the estate lawful interest on all sums which had come into his hands, and he believed *he had allowed more interest than he was bound to do. It appeared also by the answer of Garret B. Abeel that after Mrs. Weeks became of age, he set apart $10,000 for the support of Phebe Howell and her son, and to pay the $500 legacy to the latter, if he attained the age of twenty-one, which he insisted he was not bound to render an account to the complainants of at this time, or in this suit. He also admitted that he kept no separate account in bank of the moneys belonging to the estate, but that the same was placed to his own credit, and the credit of himself and partner, and used by them occasionally in the course of their business. The other defendants having put in their answers, the cause was heard on the bill and answers as to them, and on pleadings and proofs as to the acting executor

*S. A. Foot* for complainants:—The defendant, Garret B. Abeel, is bound to account to the complainants for the profits of the partnership property, notwithstanding the arrangement between him and his co-executor to take the same at the valuation of the merchants who were applied to to appraise it. Abeel should have sold the partnership goods, and invested the portion belonging to the estate of his deceased partner. He stood in the character of trustee, and could not purchase from his co-executor. He made an extra profit upon the partnership goods, in consequence of the non-intercourse act and the war with Great Britain.

[*396]

(*Green* v. *Winter*, 1 John. Ch. R. 27; *Parkist* v. *Alexander*, 1 id. 394; *Schieffelin* v. *Stewart*, 1 id. 620; *Brown* v. *Rickets, Executor, &c.*, 4 John. Ch. R. 303; *Evertson* v. *Tappan*, 5 John. Ch. R. 497; *Hawley* v. *Mancius*, 7 John. Ch. R. 174; *Holdridge* v. *Gillespie*, 2 John. Ch. R. 30; *Matthews and wife* v. *Dragaud*, 3 Dessaus. 25.) It is a settled rule that trustees can derive no benefit from the trust property, and must account for all the profits they receive from its use. (*Devoe* v. *Fanning*, 2 John. Ch. R. 252.) There is no distinction between surviving partners and trustees. (15 Ves. jun. 227.) A trustee cannot purchase any part of the trust property, except under the sanction of the court, or by the consent of the *cestui que trust*. However fair the purchase *by the trustee may be, yet it will be set aside by the court upon the application of the *cestui que trust*. The defendant, therefore, upon these principles, must account for all the profits up to this time; and if he should be unable to give a correct statement of such profits, on account of their being mixed with his individual property, he must be charged with compound interest. (*Schieffelin* v. *Stewart*, 1 John. Ch. R. 620; *Evertson* v. *Tappen*, 5 John. Ch. R. 497; *Stoughton* v. *Lynch*, 2 John. Ch. R. 209

[*397]

*C. Baldwin*, for defendants :—The defendant was not compelled to sell the partnership property. If he had sold it at public auction he could not have bid himself, and the property might have been sacrificed. The present is unlike the cases cited by the opposite counsel. (Toller, 238.) If an executor pays a debt of the testator, he may take and retain any specific chattel at its value, if not more than sufficient to discharge his debt. If a personal chattel of the testator is sold for debt, the executor may purchase at the sale. (*Lee* v. *Brown*, 4 Ves. 369; *Howe* v. *Earl of Dartmouth*, 7 Ves. 150.) If application had at that time been made to the Chancellor, he would have permitted the defendant to take the goods at a fair valuation. In this case

it is impossible there should be a resale. The severe rule that a trustee cannot purchase, ought not to be encouraged.

THE CHANCELLOR:—The first point presented by the pleadings and proofs in this case is, whether the acting executor is to be permitted to account for the partnership stock at the price fixed upon by himself and his co-executor.

I took up the case with a sincere desire to sustain the agreement or understanding upon which A. B. Abeel assumed to himself the sole ownership of the stock in trade, but I find it cannot be sustained without overturning principles of equity which have long been deemed essential to protect the rights of those whose property is committed to the care or guardianship of others. These principles are discussed at length in *Defoe* v. *Fanning*, (2 John. Ch. Rep. 252 ;) in *Rogers* v. *Rogers*, (1 Hopk. 515 ;) and in *Hawley* v. *Cramer*, (4 Cowen, 717.) It is therefore sufficient merely to advert *to these general principles here. The surviving partner has the legal right to the partnership effects ;[1] but in equity he is considered merely as a trustee to pay the partnership debts, and dispose of the effects of the concern for the benefit of himself and the estate of his deceased partner. He cannot therefore be permitted to make any gain or profit by the use of the partnership funds and effects for his own exclusive benefit. In this case, if the surviving partner had not stood in the situation of executor, he might have made a valid agreement with the personal representatives of his deceased brother, to take the stock on hand at a fixed valuation ; and whatever profit was made upon the bargain would have been his own exclusively. But one executor or trustee can make no valid agreement to purchase, or take the trust property at a fixed valuation from his co-executor or trustee, without being liable for the profits, if any are made by the agreement.[2] It follows from these principles that the com-

[*398]

[1] *Murry* v. *Mumford*, 6 Cow. 441 ; *Van Kuren* v. *Parmellee*, 2 Comst. 523.
2] As to the general principal that a trustee, executor, agent, or other

1829.

Case
v.
Abeel.

plaintants would be entitled to an account of the profit made by the increased value of the stock in trade, in the

person acting in a fiduciary character, cannot become a purchaser for himself, or otherwise derive a private benefit from the disposal and management of trust property or funds, or from the peculiar relation in which he stands as a trustee. See *Wedderburn* v. *Wedderburn*, 2 Keen, 722; S. C., 4 M. & Cr. 41; Anon., 2 Russ. 350; *Shaw* v. *Rodes*, id. 539; *Lees* v. *Nuttall*, 1 Russ & M. 53; S. C., 2 M. & K. 819; S. C., Taml. 282; *Docker* v. *Somes*, 2 M. & K. 664; *Taylor* v. *Salmon*, 4 M. & C. 139; *Green* v. *Winter*, 1 John. Ch. 26; *Packist* v. *Alexander*, id. 394; *Holridge* v. *Gillespie*, 2 id. 30; *Hart* v. *Ten Eyck*, id. 104; *Davoue* v. *Fanning*, id. 257; *Schieffelen* v. *Stewart*, 1 id. 620; *Duncomb* v. *Duncomb*, id. 510; *Brown* v. *Ricketts*, 4 id. 305; *Moor* v. *Frowd*, 3 M. & C. 45; *Stiles* v. *Burch*, 5 Paige, 134; *Reed* v. *Warner*, id. 650; *Hawley* v. *Cramer*, 4 Cow. 717; *Van Epps* v. *Van Epps*, 9 Paige, 238; *Quackenbush* v. *Leonard*, id. 334; *Torrey* v. *Bank of Orleans*, id. 663; *Smith* v. *Langford*, 2 Beav. 362; 1 Story's Eq. sec. 316, 465; 1 Liv. Agency, 422, 425; Hill on Trustees, 379.

In *Docker* v. *Somes*, 2 Mylne & Keen, 664, it was decided that, if a trustee mixes trust funds with his private moneys, and employs both in trade for his benefit, the *cestui que trust* may insist on a proportionate share of the profits, if he prefers it instead of interest on the amount of trust funds so employed. Lord Brougham, on this occasion, delivered the following judgment, which strikingly exemplifies the rule in the text. "Whenever a trustee, says his Lordship, or one standing in the relation of a trustee, violates his duty and deals with the trust estate for his own behoof, the rule is, that he shall account to the *cestui que trust* for all the gain he has made. Thus, if trust money is laid out in buying and selling land, and a profit made by the transaction, that shall go, not to the trustee who has so applied the money, but to the *cestui que trust*, whose money has been thus applied. In like manner (and cases of this kind are more numerous), where a trustee or executor has used the fund committed to his care in stock speculations, though loss, if any must fall upon himself; yet, for every farthing of profit he may make, he shall be accountable to the trust estate. So, if he lay out the trust moneys in a commercial adventure, as in buying or fitting out a vessel for a voyage, or put it in the trade of another person, from which he is to derive a certain stipulated profit, although I will not say that this has been decided, I hold it to be quite clear that he must account for the profits received by the adventure, or from the concern. In all these cases it is easy to tell what the gains are. The fund is kept distinct from the trustees, other moneys and whatever he gets he must account for and pay over. It is so much fruit, so much increase on the estate or chattel of another, and must follow the ownership of the property and go to the proprietor. So it is also, where one not expressly a trustee, has bought or trafficed with another's money. The law raises a trust by implication, clothing him, though a stranger, with the fiduciary character, for the purpose of making him accountable. If a person has purchased

hands of the acting executor, if it could be ascertained. But the stock in trade of the partnership having been mixed with other goods of the defendant, and sold out by

land in his own name with my money, there is a resulting trust for me; if he has invested my money in any other speculation, without my consent, he is held a trustee for my benefit. And so an attorney, guardian, or other person, standing in a like situation to another, gains not for himself, but for the client, or infant, or other party, whose confidence has been abused. Such being the undeniable principle of equity, such the rule by which breach of trust is discouraged by intercepting its gains and thus frustrating the intentions that caused it; punished by charging all losses on the wrong-doer, while no profit can ever accrue, can the court consistently draw the line, as cases would seem to draw it, and except from the general rule those instances where the risk of the malversation is most imminent; those instances where the trustee is most likely to misappropriate; namely, those in which he uses the trust funds in his own traffic? At first sight, this seems grossly absurd. Some reflection is required to understand how the court could ever, even in appearance, countenance such an anomaly. The reason which has induced judges to be satisfied with allowing interest only, I take to have been this. They could not easily sever the profits attributable to the trust money, from those belonging to the whole capital stock; and the process became still more difficult where a great proportion of the gains proceeded from skill or labor employed upon the capital. In cases of separate appropriation, there was no such difficulty; as, where land or stock had been bought, and then sold again at a profit. And here, accordingly, there was no hesitation in at once making the trustee account for the whole gains he had made. But where having engaged in some himself, he had invested the trust money in that trade along with his own, there was so much difficulty in severing the profits which might be supposed to come from the money misapplied, from those which came from the rest of the capital embarked, that it was deemed more convenient to take another course, and instead of endeavoring to ascertain what profit had been really made, to fix upon certain rates of interest, as the supposed measure or representative of the profits, and assign that to the trust estate. This principle is undoubtedly attended with one advantage; it avoids the necessity of an investigation of more or less nicety, in each individual case, and it thus attains one of the important benefits resulting from all general rules. But mark what sacrifices of justice and expediency are made for this convenience. All trust estates receive the same compensation, whatever risks they may have run during the period of their misappropriation; all profit equally whatever may be the real gain derived by the trustee from this breach of duty; nor can any amount of profit made, be reached by the court, or even the most moderate rate of mercantile profit that is the legal rate of interest, be exceeded, whatever the actual gains may have been, unless by the very clumsy and arbitrary method of allowing rests, in other words, compound in-

1829.

·Case
v.
Abeel.

retail at different periods, those profits ·cannot now be as-certained.

Under these circumstances, I should still ·be disposed ·to let the original valuation stand, if I had not reason to be-

·terest; and this without the least regard to the profits actually realized. For, in the most remarkable case in which this method has been resorted to, (*Rap-hael* v. *Boehm*, which is indeed always cited to be doubted, if not disap-·proved,) the compound interest was given with a view to the culpability of the trustee's conduct, and not upon any estimate of the profits he had made by it. But the principal objection which I have to the rule, is founded upon its tendency to cripple the just power of this court, in by far the most whole-some, and, indeed, necessary exercise of its function, and the encouragements thus held out to fraud and breach of trust. What avails it towards prevent-ing such malversation that the contrivers of sordid injustice feel the power of the court only where they are clumsy enough to keep the gains of their dis-honesty severed from the rest of their stores?

It is in vain, they are told, of the court's arm being long enough to reach them, and strong enough to hold them, if they know that a certain delicacy of touch is required, without which the hand might as well be paralyzed or shrunk up. The distinction I will not say, sanctioned, but pointed at by the negative authority of the cases, proclaims to executors and trustees that they have only to invest the trust money in the speculations, and expose it to the hazards of their own commerce, and be charged 5 per cent. on it; and then they may pocket 15 or 20 per cent. by a successful adventure. Surely the supposed difficulty of ascertaining the real gain made by the misapplication, is as nothing compared with the mischiefs likely to arise from admitting this rule, or rather this exception to one of the most general rules of equitable jurisdiction. Even if cases were more likely to occur, than I can think they are, of inextricable difficulties in pursuing such inquiries, I should still deem this the lesser evil by far, and be prepared to embrace it. Mr. Solicitor-Gen-·eral put a case of a very plausible aspect, with a view of deterring the court from ·taking the course which all principle points out. He feigned the in-stance of an apothecary buying drugs with 100*l*. of trust money, and earning 1,000*l*. a year by selling them to his patients; and so he might have taken the ·case of trust ·money laid out in purchasing a piece of steel or skein of silk, ·and these being worked up into goods of the finest fabric, Birmingham trink-ets or Brussels lace, where the work exceeds by 10,000 times the material in value. But such instances in ·truth prove nothing; for they are cases, not of profits upon stock, but of ·skilful labor very highly paid; and no reasonable person would ever dream of charging a trustee, whose skill thus bestowed had so enormously augmented the value of the capital, as if he had only ob-tained from it a profit; although the refinements of the civil law would cer-tainly bear us out, even in charging all gains accruing upon those goods as in ·the nature of accretions belonging to the true owners of the chattels."

lieve there was some mistake in the estimate then made. The witnesses speak of the value of such kinds of goods in the middle of the year 1811 ; and the estimate of Duryea and Mowatt was undoubtedly made with reference to the state of the market on the 1st of July in that year, when the partnership was advertised as dissolved by the death of John Abeel. But it is certain the surviving partner did not at that time determine to take the goods on hand at the valuation of Duryea and Mowatt.

It is true, he says in his answer, that half the stock in trade was credited to the estate on the 1st of July, 1811. But, by adverting to the testimony and exhibits, it is evident he did not mean to say he had at that time concluded to take the property, and actually credited the estate with its proportion *on that day. He came to that conclusion some time afterwards, and then credited the same as the 1st of July, 1811. He had not determined to take it at that valuation when the opinions of Mr. Riggs and Mr. Harrison were obtained, on the 6th and 10th of August. Soon after these opinions were taken, they commenced inventorying the goods. Dunscomb says it was a long and tedious business, and that they were engaged a month or six weeks in doing it. After this inventory was completed, Duryea and Mowatt made their valuation. They undoubtedly made it with a reference to the state of the market on the 1st of July preceding, as the surviving partner acted under the erroneous impression that he was entitled to retain the stock at its then value. Under this impression he very honestly credited the amount to the estate as of that date, that the interest might commence from that time. But in this he acted under a mistake as to his equitable rights. It does not distinctly appear at what time he did finally conclude to take the goods, and charge the amount to himself in his account with the estate. But by adverting to the history of the times, it is pretty evident that the value of the stock had been enhanced between the first of July and the completion of the inventory ; or, at

least, that circumstances had so changed that an advance in the price of such articles might be reasonably expected.

The proclamation of the president, announcing the revocation of the Berlin and Milan decrees, was issued on the 2d of November, 1810; of course the non-intercourse act went into operation against Great Britain on the 2d of February thereafter. In the intermediate time it is probable considerable importations of hardware and iron mongery were made. This circumstance, in connection with the fact that it was generally supposed Great Britain would repeal the orders in council, would for a time keep down the value of that description of goods, although fresh supplies could not be immediately obtained. The last information received from the British cabinet, previous to the close of the session of Congress after the intercourse was stopped, was a declaration from the minister that the British system would be *abandoned as soon as the repeal of the French decrees had actually taken place. But in the course of the summer of 1811, the prospect of obtaining fresh supplies from England was materially changed. It was officially known that instead of repealing the obnoxious orders, Great Britain had enforced them more rigidly; and Commodore Rogers had been compelled to chastise the insolence of one of her naval officers, in attempting to execute those orders; on which occasion blood was shed. On the 24th of July, the president called a special meeting of Congress, to take place early in November; towards the close of which session it is well known war was actually declared. From the time when this special meeting of Congress was called, a war with England, or a much longer continuance of the non-intercourse system at least seemed inevitable. A very considerable advance in the value of hardware and iron mongery must, therefore, have been anticipated before the inventory of the goods in question was completed. Notwithstanding this great change in our commercial relations with Great Britain, the currency goods, more than five-sixths of the value of the whole stock of the partner-

ship, were estimated at the original cost. It also appears from the inventory that at least $30,000 of the currency goods was in rolled and bar iron, steel, anchors and anchor palms, share moulds, nail rods, and other articles of that description, which could not be very materially injured by lying on hand. And the actual value of those articles could readily have been ascertained, without reference to the original cost. The witnesses in this case may not have succeeded in conveying their real meaning. Possibly the currency price is a nominal value put on the articles, from which a deduction was made on the original purchase. But as I understand the testimony, these goods were estimated at the original prices paid for them on the purchase, without any addition for commission or importation charges. Whether the $6,768 worth of stock actually sold by the surviving partner, before the inventory was completed, is estimated at the original cost, or put down at the price for which the goods actually sold, does not appear.

*There must, therefore, be a new valuation put upon the stock in trade on the first of October, 1811, which is probably full as early as the time when the acting executor assumed the absolute ownership of the property. The valuation must also be made in reference to the nature of the particular stock on hand, and the then existing and probable relations of the country; and the good will of the business must also be taken into consideration. The goods sold before that time, as mentioned in the inventory of currency goods, must be separated therefrom; and if estimated at the original costs, must be charged with the additional prices obtained on the sale. Interest must be charged against the acting executor, and the accounts taken upon the principles sanctioned by the last decree of this court and the decision of the Court of Errors in *Clarkson* v. *De Peyster*, except that in stating the account, the five per cent. allowed to the executors on the income of the estate must be deducted from the interest or income from time to time, and only the balance thereof charged. This account must thus

be continued up to the time when Mrs. Weeks came of age.

The next question is as to the manner in which the account is to be taken so as to give the adopted children a support out of the general funds of the estate, on principles of equality. If the same expense had been bestowed upon each, the niece, who was much the oldest, would have in fact received a less proportion of the property than the younger children who were to be supported out of it for a much longer period, provided that support was taken from the bulk of the estate, instead of being charged upon the particular share of each. But it was probably in the contemplation of the testator that each should be supported out of her own share, as the executors are directed to pay over their proportions as they respectively arrive at the age of twenty-one. The expenses of each would be greatly increased as they approached the termination of their minority. If the oldest was supported out of the bulk of the estate until twenty-one, and then permitted to withdraw the whole of her share from the fund, great injustice would be done to the younger children; and if this principle is adopted, the *payment of the $2,500 to Mrs. Weeks as an equivalent for support which was not actually rendered or necessary, cannot be sustained. The executor has acted on the supposition that he was not to bestow an equal expense for the support and education of each child, but was authorized to exercise a discretion in relation to that matter. His niece was about nine years of age at the death of the testator, and she has had expended for her support and education, for the period of twelve years, $6,545, which is about $1,500 more than was expended on Mrs. Case for a period of time three years and a half longer. The expenses bestowed upon the two children of Phebe Howell were probably much less. No injustice, therefore, will be done to Mrs. Weeks and Mrs. Case, if the whole amount of their support is charged upon their respective proportions of the estate, leaving the future as well as the past expenses of the

[*402]

two infant children of Phebe Howell to be charged on their respective shares of the estate only.

As the will originally stood, there could be no difficulty in keeping the accounts of each of the children separately. A sum sufficient to raise the annuity to Mrs. Howell should have been set apart for that purpose, and the rest divided into four equal shares and kept separate and distinct. Even after the codicil had provided for the support of another child out of the estate, there would have been no difficulty in setting aside a sufficient sum for that purpose, or, what would have been more simple than either, the executor might annually have charged one-fourth of the support of Phebe Howell and her son to the share of each of the adopted children. In consequence of the manner in which the fund has been kept and managed, it must be extremely difficult to state the account anew from the beginning; but I see no other way of doing justice between the parties.

Executors and trustees must be made to understand that it is their duty to keep the funds of their trust separate and distinct from their other funds and business; that they should, upon no consideration, use the trust moneys themselves, or permit it to be mingled with their own moneys or property. In no other way can they save themselves from trouble, litigation and censure. If they neglect this obvious duty, they *have no reason to complain if they meet with trouble and expense, and sometimes with heavy loss. The protection of the rights of those who are not in a situation to protect themselves, makes it the duty of courts of justice to require fiduciaries to make good all losses which have been occasioned by their neglect.

As the executor has made a final settlement with Weeks for the share of his wife's estate up to the time when she became of age, no new account need be taken of her share previous to that time. But she will be entitled to an account of the administration of her portion of the $10,000 set apart for the support of Phebe Howell and her infant son.

[*403]

1829.

Case
v.
Abeel.

The master must state three separate accounts up to the 28th of May, 1823, when Mrs. Weeks became of age, be· tween the acting executor and Mrs. Case and the two daughters of Mrs. Howell.

In the account with Mrs. Case, the master must charge the executor one-fourth of all sums properly chargeable against him on account of the estate, and interest on the principles before stated, after deducting commissions, and must credit him one-fourth of all moneys expended for the general purposes of the estate, and for the payment of the specific or pecuniary legacies or debts, or for the support of Mrs. Howell or her infant son, and the whole amount expended for the maintenance and education of Mrs. Case, or other expenditures properly chargeable upon her share exclusively. And the accounts between the executor and the two children of Phebe Howell must be taken in the same manner. On the 28th of May, 1823, $2,500 must be taken from the balance due each, to make up their shares of the $10,000 fund, appropriated, at that time, for the support of Mrs. Howell and her son. The separate accounts must then be continued upon the balance, in the same manner, except as to the support of Mrs. Howell and her son and the general expenses of the estate, which must, from that time, be charged upon the $10,000 fund. And a distinct account of the administration of that fund, as between the acting executor and all the adopted children, must be taken by the master. The executor is not to be charged for a

[*404]

greater rate of interest than was actually *received on moneys *bona fide* loaned by him on bond and mortgage. There is no foundation for the charge that he put it out for a rate of interest less than seven per cent. unnecessarily or improperly. His own interest required that he should procure the greatest possible income from that part of the estate which was loaned out on bond and mortgage ; and I am satisfied from the testimony that all the loans which were made under seven per cent. were so made in good faith.

There must be a reference to a master to take and state the account upon these principles and directions; and he must also ascertain and report the situation of the trust fund which is now invested in stocks or on bond and mortgage, and whether the same is properly secured and safely invested. And the question of costs, and other questions and directions are to be reserved.