Niles<br>*v.*<br>Drake.

## WILLIAM R. P. WASHBURN *versus* HORACE H. GOODMAN *et al.*

On the death of one of four partners and the consequent dissolution of the partnership, one of the survivors took out letters of administration upon the estate of the deceased partner, and the three survivors formed a new partnership and took to themselves the stock on hand, giving each his own individual note, for one third of the appraised value, payable to the three. It was *held*, that this supposed sale was ineffectual, and that the three surviving partners were *jointly* accountable to the funds of the old partnership, for the value of the stock.

By an indenture of partnership, between one as a silent partner and three others as active partners, it was stipulated that the profits and losses should be shared equally, and that the active partners should constantly endeavor to promote the joint interest by their attention and industry, and upon the determination of the copartnership, should make a true, just and final account of all things relating to the firm, and well and truly adjust the same. It was *held*, that the active partners were not entitled to compensation for their services, after the dissolution of the partnership, in settling the partnership concerns.

The partnership having been dissolved by the death of the silent partner, it was *held*, that he surviving partners should be charged with interest on his share of the capital stock, after the lapse of a reasonable time for settling the partnership concerns.

By the indenture the partnership was to continue three years, and the active partners took, in their individual names but for the use of the firm, a lease of a store for five years, which was occupied by the firm until its dissolution by the decease of the silent partner, and afterwards the residue of the term was disposed of by the surviving partners at an advanced rent. It was *held*, that the estate of the deceased partner was entitled to a proportion of the advance in the rent.

After the death of the silent partner the surviving partners continued the business of

Washburn
v.
Goodman.

the firm as usual until the time fixed by the indenture for the termination of the partnership, and during that interval contracted some bad debts and made some profits. It was *held*, that if the estate of the deceased took a share of such profits, it should also be charged with such bad debts ; that the whole of the transactions should be adopted or the whole repudiated.

On a bill in equity for an account between partners, after a dissolution of the partnership and after the disposal of the joint property, the proceeds being in the hands of a receiver, the Court will permit a creditor to intervene by petition, for the purpose of obtaining satisfaction of a debt due from the partnership.

Goods belonging to a partnership were consigned to a merchant abroad, for sale part of them in the lifetime of all the partners, and the residue after the death of one of them and consequent dissolution of the partnership, by the surviving partners, and advances were made upon the goods by the consignee before and after the death, which went into the partnership funds and were applied to the debts of the firm; the consignee having no notice of the death. The proceeds of the sales fell short of the sums advanced. It was *held*, that the consignee's claim to reimbursement for the excess of his advances, as well upon the goods consigned after as upon those consigned before the death, was chargeable upon the partnership funds in the hands of the surviving partners.

BILL in equity, in which William R. P. Washburn, as administrator *de bonis non* of Nathaniel Tucker, was plaintiff, and Horace H. Goodman, William O. Saville, and William A. Kent, as administrator on the estate of John Kent, were defendants. The suit was commenced on January 15, 1827.

The bill sets forth, that on January 23, 1822, Tucker, Goodman, Saville and John Kent entered into an indenture of copartnership, for the purpose of buying and selling all sorts of merchandise in Boston or elsewhere.

In the indenture it was declared and agreed, that the partnership should continue from January 1, 1822, for the term of three years ; that the business should be done under the name and firm of Goodman, Saville and Kent ; that the parties jointly paid and delivered in as stock, the sum of $25,403·89, being the net profits of the business done by the firm of Goodman & Saville ; that Tucker paid in as stock the further sum of $20,000, and J. Kent the further sum of $10,000 ; that each partner should receive one fourth part of the profits of the business and sustain one fourth part of the losses ; that at the expiration of the term of the copartnership and the final adjustment of its concerns, Tucker and J. Kent should be entitled to receive, in addition to their shares of the profits, the sums respectively paid by them as stock ; that Tucker, being a silent partner, should not be required to perform any

personal services in prosecuting the business of the copartner-
ship ; that Goodman, Saville and J. Kent, as active partners,
should constantly endeavour to promote the joint interest of the
copartnership, by unremitting attention, diligence and industry,
and that upon the determination of the copartnership, they, or
the survivors of them, should make a true, just and final ac-
count of all things relating to the firm and well and truly adjust
the same.

The bill further states, that the parties to the indenture
prosecuted the business of the copartnership to profit and ad-
vantage until November 3, 1824, at which time Tucker died,
whereby the copartnership was dissolved ; that nevertheless
the surviving partners continued to negotiate business under
the firm of the former copartnership, and to use the capital
stock, and the profits which had accrued thereon, belonging to
Tucker ; that on December 7, 1824, J. Kent was appointed
administrator on the estate of Tucker, J. Kent still continu-
ing in business with Goodman and Saville ; that on January 6,
1826, J. Kent died ; that on February 20, 1826, William A.
Kent was appointed administrator on the estate of J. Kent ;
that on January 10, 1826, the plaintiff was appointed adminis-
trator *de bonis non*, on the estate of Tucker ; that the plaintiff
has repeatedly requested the defendants to render a true, just
and final account of all things relating to the firm of Good-
man, Saville & Kent, and well and truly to adjust the same,
and to pay over to the plaintiff the $20,000, capital stock,
paid in by Tucker, with interest thereon, and one quarter part
of the $25,403·89, and all the goods, wares and merchandise
in the concern, belonging to Tucker, and his share of the
profits, all of which the defendants have refused to do ; and
that Goodman and Saville have lately failed in business, and
by an indenture, to which the plaintiff was not a party, as-
signed their visible property to Henry Hovey and Sargent
S. Littlehale for the payment of certain creditors named in
the indenture.   The bill prays for a discovery, and that an
account of all the partnership dealings of Goodman, Saville
& Kent may be rendered, and that the defendants may be
directed to pay over all sums of money, and transfer and de-
liver over all choses in action, books of account and other

44 *

property belonging to the company of Goodman, Saville & Kent, to such person as the Court shall order, and that they may be restrained from collecting debts due to the company, and paying away or transferring money or other property of the company, except by the order of the Court, and that a receiver may be appointed.

The defendants filed answers to the bill, and the plaintiff put in replications. The bill and answers were referred to B. R. Nichols, Esq. and upon his report a receiver was appointed. Subsequently the case was referred to Mr. Minot, a master in chancery.

The master reported, that a copartnership was entered into by Tucker, Goodman, Saville and J. Kent, on the terms set forth in the bill, and that Tucker and Kent died, and that administration was granted upon their estates, as before mentioned ; that the business of the firm was continued as usual, by the survivors of Tucker, until January 1, 1825, when the stock of merchandise was appraised at $18,609·31, being equivalent to the value at six months' credit ; that about that time the surviving partners agreed to continue business as copartners under the name of Goodman, Saville & Kent ; that they retained the stock of the old firm, and each of them made a note, dated January 1, 1825, payable in six months, to Goodman, Saville & Kent, for one third of the stock so taken, and entries were made of these transactions, in the books of the old firm, as of a sale of the stock ; that the plaintiff had charged the defendants jointly, as surviving partners, with the sum of 18,609·31, which charge the master allowed.

The master further reported, that in April 1823, a lease under seal was executed to Goodman, Saville & Kent, as copartners, of a store in Merchants' Row in Boston, for the term of five years, at the rent of $800 a year, which store was occupied by the first firm until its dissolution, and afterwards by the new firm until the store was taken down by the city. A new store was erected on the site of the old one, into which the new firm removed, holding it under the original lease, and they continued to occupy it until they failed, on December 26, 1826. On February 8, 1827, the store was

,et by the lessor, with the consent of Goodman and Saville, at an advanced rent of $700 per annum, which advance he agreed to allow to them. The store was hired originally for the use of the old firm, and was taken for five years, because the lessor refused to rent it for a shorter term. Tucker did not execute the lease. The advanced rent was paid by the lessor to the use of Goodman and Saville, being $516·46 ; which sum the plaintiff claimed should be credited to the old firm, and the master allowed this claim.

The business of the old firm was continued by the surviving partners from the death of Tucker to January 1, 1825, during which period sales were made on credit, and several debts contracted which were supposed to be bad, amounting to $3190·65. It was stated by the defendants, that a profit of $1167·96 arose on the copartnership business, during that period, which ought to be deducted from the sum of the bad debts. But the master considered the surviving partners not authorized by law to sell the partnership property, on a credit, without security, after the dissolution, and he allowed the amount of the bad debts against the surviving partners ; from which was to be deducted any sums which might subsequently be collected by the receiver.

The master allowed interest on the capital stock of Tucker and Kent from June 10, 1826, considering that the affairs of the copartnership could not conveniently have been settled at an earlier period.

The defendants insisted that the old firm were indebted to Bainbridges & Brown, of London, in the sum of $1470 The master was of opinion, that the old firm was not properly liable for the sum due to Bainbridges & Brown, but that the whole property of the old firm should not be distributed among the partners, without security to the defendants against this liability. He stated that there were no other debts due from the firm, and that no claim had been made by Bainbridges & Brown against the surviving partners or Tucker's administrator.

The defendants excepted to these allowances made by the master. They excepted also, because he disallowed the claim of the surviving partners Goodman and Saville to $2723·02

each, being a commission of five per cent. for their services in collecting debts and settling the business of the copartnership.

*Fletcher* supported the exceptions. As to the defendants' being charged jointly with the sum of $18,609·31, he said the surviving partners intended to divide the merchandise on hand at the death of Tucker, equally between them, and to become individually liable for one third each ; that J. Kent, as administrator of Tucker, consented to this arrangement ; that the appropriation of the property in this manner was lawful ; and that it had occasioned no loss to Tucker's estate.

In regard to the lease of the store, he said that after the expiration of the three years to which the partnership was originally limited, Goodman, Saville & Kent occupied the store as exclusively their own and paid the rent ; that if the store had fallen in value after the term of three years had expired, Tucker's estate would not have been subject to the loss ; and on the other hand, it was not entitled to the benefit of the increased value.

He denied that the defendants were to be charged with the bad debts incurred since the death of Tucker. They were under no obligation to take security, on making a sale. It was not like a sale by an executor or administrator ; the merchandise was not the property of Tucker, but of the copartnership ; and the surviving partners, acting in good faith, had an unlimited authority in making sales.

Interest from June 10, 1826, upon the capital stock, ought not to be allowed. When the affairs of the company should be ultimately settled, all the partners were to receive their respective shares of the capital stock ; and no interest can be allowed without substituting a new contract in the place of the indenture. If there be unreasonable delay in settling the partnership concerns, the remedy is an application to a judicial tribunal to expedite the settlement. This capital is not a debt ; until a settlement is made, it belongs to Goodman and Saville, as much as to Tucker's estate.

So long as the copartnership continued in operation, the active partners, by the terms of the indenture, were not entitled to compensation for their services ; but t was dissolved, and

their claim to compensation for settling the copartnership con- Washburn
cerns rests on the same principle as compensation to admin-   *v*
strators.                                                     Goodman.

*S. Hubbard* and *Washburn*, for the plaintiff.     In regard to
cnarging the defendants jointly, they said the consent of J.
Kent, as administrator of Tucker, to the appropriation of one
third of the merchandise to each of the surviving partners, was
unauthorized and ineffectual ; that there was no sale to the
partners individually ; that an action could not be maintained
upon the notes by the promisees against one of themselves ; and
that supposing the transaction to be valid, the defendants must
be deemed liable for negligence in not collecting the notes of
each other at the expiration of six months, when they fell
due.

The defendants were bound to settle the partnership con-
cerns within a reasonable time, and interest was rightfully
allowed.    *Stoughton* v. *Lynch*, 2 Johns. Ch. R. 219.

As to the claim to compensation for services, they cited
*Franklin* v. *Robinson*, 1 Johns. Ch. R. 165 ; *Bradford* v.
*Kimberley*, 3 Johns. Ch. R. 431 ; *Burden* v. *Burden*, 1 Ves.
& Beames, 170.

PARKER C. J. delivered the opinion of the Court.    In re-   *June 26th,*
gard to the stock belonging to the company at the dissolution     1828.
by the death of Tucker, it was rightfully in the possession of
the surviving partners, subject to disposition by sale, they be-
ing jointly accountable to the administrator of Tucker for the
amount of his interest therein.    They could not discharge
themselves of this joint liability without the consent of the rep-
resentative of Tucker, and such representative, if he did con-
sent, would immediately become chargeable with the amount
to Tucker's estate.    The act of John Kent in thus appro-
priating the stock was his private act, and did not bind the
estate of Tucker ; therefore in the settlement of the account
it was right to charge the stock on hand at the death of Tuck-
er to the firm.    The disposition they made of it amounting to
a sale by them to each one, it was a joint disposition ; and
then it became the joint property of the three survivors, who
put it into the stock of the new firm.    They remained indebt-
ed to the estate of Tucker for his portion, and are rightly

charged by the master in that form. The notes given by each to the firm, can have no other purpose than to show the proportion which each claims of this part of the stock of the new ·company, and come into a settlement with the new firm.

In regard to the claim of commissions by the defendants, we think they are precluded by the indenture of copartnership from supporting this claim. On the dissolution the survivors are to make a true, just and final account of all things relating to the firm, and well and truly adjust the same. This includes payment of debts and collection, so far as respects the personal services of any of them. And it was mutual, all being bound to do the same. Actual expense and charge attending the settlement would not be included.

As to interest : The survivors became indebted to Tucker's estate for the capital, on his death. Time should be allowed them to settle the affairs, collect and pay debts, after which they ought to be charged with interest. Eighteen months were allowed, during which time they are not charged with interest. We think the time fixed by the master for interest to commence, is reasonable.

The next question relates to the advance upon the rent. The lease was taken by the active partners in their individual names, but for the use of the firm of which Tucker was one. He therefore had a joint interest in it, and we see no reason why he should not have his proportion of its value, above what was paid to the lessor.

With respect to the bad debts arising from the continuing of the business of the firm, the report requires some revision. Strictly speaking, there was no authority to trade on account of Tucker's estate after his death. But if the profits have gone to swell the debt to the copartnership, an equa sum should be deducted from the charge of bad debts. The whole transaction should be adopted or repudiated.

The exception to this part of the master's report is allow ed ; the other exceptions are overruled.

On December 21, 1829, a petition was filed by John Bainbridge and Thomas Brown, of London, surviving partners of George Bainbridge, representing that the copartnership of

Goodman, Saville & Kent, including Tucker, was indebted to the petitioners as surviving partners, in the sum of $1296·76, with interest from March 6, 1827, together with the difference of exchange between the United States and Great Britain ; that the copartnership of Goodman, Saville & Kent, includ- ing Tucker, shipped and consigned certain furs to Bainbridges & Brown, for sale, upon condition that they should make cer- tain advances thereon, according to the course of trade, and drew bills of exchange on Bainbridges & Brown, which they paid on the faith of such shipments ; that the sales of the furs did not produce a sum sufficient to repay the advances ; that the proceeds of the bills of exchange went to the benefit of the firm of Goodman, Saville & Kent, including Tucker, and constituted a portion of the partnership stock, of which Washburn, the representative of Tucker, has called for an account, in his bill in equity ; that Tucker died before the close of the sales, and that knowledge of his death was not obtained by the petitioners until after the payment of the bills of exchange ; that Goodman and Saville are insolvent, and that the estate of J. Kent is represented to be insolvent. And the petitioners pray that they may be allowed to intervene and have the benefit and advantage of the bill and of all proceed- ings under it, in like manner as if they had been originally parties thereto. And they allege, that the proceeds of the bills of exchange went into the partnership funds and make a part of the funds in the hands of the receiver ; and that the amount due to the petitioners ought in equity to be a charge on the joint funds, and before a final distribution of the re- siduum among the partners or their representatives, payment should be decreed to the petitioners.

To this petition, Washburn, the plaintiff, filed an answer.

*Fletcher* and *Aylwin*, for the petitioners, contended that the Court had general equity jurisdiction of the subject of the plaintiff's bill, by virtue of *St.* 1823, *c.* 140, § 2, authorizing them to "hear and determine in equity all disputes between copartners, joint tenants and tenants in common, and their le- gal representatives, in cases where there is no adequate reme- dy at law ;" that the Court could not decree on the rights of the partners, without inquiring into the debts and credits of the

*Margin:* Washburn *v.* Goodman.

*Margin:* March 17th. 1831

firm, and would go into such inquiry as a collateral matter necessarily incident to their general equity jurisdiction in the case of partners ; *Amory* v. *Francis,* 16 Mass. R. 310 ; *Pomeroy* v. *Winship,* 12 Mass. R. 525 ; *Dwight* v. *Pomeroy,* 17 Mass. R. 327 ; *Chandler* v. *Chandler,* 4 Pick. 78 ; *Ferry* v. *Henry,* 4 Pick. 77 ; *Hunt* v. *Maynard,* 6 Pick. 489 ; [and see *Holland* v. *Cruft,* 20 Pick. 325 ;] and that the form of this application (by petition) was proper and according to the English practice ; *Duke of Bolton* v. *Williams,* 4 Bro. C. C 430 ; *Codwise* v. *Gelston,* 10 Johns. R. 521 ; *Disbrow* v. *Henshaw,* 8 Cowen, 356.

*S. Hubbard* and *Washburn, contrà.* The Court have not jurisdiction of this application, under *St.* 1823, *c.* 140, because the petitioners are not partners of any of the parties to the bill ; and because the petitioners have an adequate remedy at law (unless they have lost it by their own laches) by assumpsit against the surviving partners of the original firm of Goodman, Saville & Kent, and against the representatives of the deceased partners ; *St.* 1799, *c.* 57 ; *Hoar* v. *Contencin,* 1 Bro. C. C. 27 ; Mitf. Pl. 89 ; *Brinkerhoff* v. *Brown,* 4 Johns. Ch. R. 679 ; *Williams* v. *Brown,* 4 Johns. Ch. R 682 ; *Hadden* v. *Spader,* 20 Johns. R. 567 ; *Donovan* v. *Finn,* Hopkins, 59 ; *Stone* v. *Hobart,* 8 Pick. 464.

WILDE J. delivered the opinion of the Court. As we understand the counsel, a single question only is now intended to be submitted to our determination. Other questions have been introduced, and remarked upon, but as to these our opinion will be suspended until the parties shall be fully heard.

The question now is, whether we have jurisdiction over the subject matter of this petition.

By the *St.* 1823, *c.* 140, this Court has equity jurisdiction in all disputes between partners and their legal representatives. The petitioners, not being partners with the parties in the principal suit, could not sustain an original, independent bill, as creditors of the partners, to obtain satisfaction for their debt from the partnership effects ; their only remedy is by action at law, unless they can intervene in the principal suit between the partners. Whether they can obtain satisfaction in this form, is a question to be determined by the construction of the stat-

ute, the principles of equity, and the course of proceedings in courts of equity. It was decided in the case of *Dwight* v *Pomeroy et al.* 17 Mass. R. 303, that the chancery jurisdiction of this Court under the statute of 1817, c. 87, was to be limited to those subjects which are expressly brought within it by statute, and that no other subject was to be included by implication ; but as to those subjects of which the Court has equity jurisdiction, the power conferred was full and general ; and that the principles of equity as settled in the chancery courts in England might be applied, as well as the forms of proceedings used in those courts. The rule of construction adopted in that case has been ever since strictly and uniformly observed ; it is in accordance with the language of the statute and the obvious intention of the legislature ; and it has been applied to all the subsequent statutes enlarging the chancery jurisdiction of the Court, so that it is now well established, that the Court will not take cognisance of any subject matter or case in equity, unless they are authorized expressly so to do by statute. And it is equally well established, that when the Court has jurisdiction of any subject matter or case in equity, it is clothed with full and ample power, and generally will proceed in the same manner as courts of similar jurisdiction do in England. Any other rule would be mischievous, and must, in many cases, defeat the salutary purposes intended by the legislature in conferring upon the Court this new jurisdiction. The powers exercised by courts of chancery are such generally as are necessary, or highly useful and convenient, in the due exercise of their peculiar jurisdiction.

The question then would be, whether a court of chancery in England, on a bill for an account between partners, after a dissolution of the partnership, and after the disposal of the joint property, the proceeds being in the hands of a receiver, would permit a creditor to intervene by petition, for the purpose of obtaining satisfaction of a debt due from partners in the course of their partnership dealings.

It is well settled, that creditors have a primary claim on the partnership funds, and that a partner cannot be compelled to account and divide the property, until he is first discharged of his liability for the partnership debts. ' In the case of *Camp-*

*bell v Mullett*, 2 Swanst. 574, it is said, that in taking the account between partners there is that equity affecting each of them, that every partner shall be discharged from his liability in respect of the partnership debts, before any division of the funds liable to those debts between the partners. And the Master of the Rolls says, that " the rights of creditors in such a case are indisputable ; a long series of authorities has established the equities of creditors, to be worked out through the medium of the partners. They have no lien, but something approaching to lien ;" though not such as to " prevent the partners from effectually transferring the property by *bonâ fide* alienation," *p.* 575. The equity of the creditors is founded, as Lord *Eldon* remarks, on the equity of the partners ; and also on their contribution to the partnership funds.

The principle is, *qui sentit commodum, sentire debet et onus* The partnership property therefore must be first applied to the payment of the partnership debts, before it can be divided between the partners without their consent. Before a division of the partnership effects, the court must first ascestain whether any partnership debts are outstanding ; and this question is commonly raised by the pleadings, on a bill for an account and division of the partnership property ; and two sets of accounts are to be taken ; the accounts of the outstanding debts, and the accounts *inter se.* Either party, therefore, in the principal suit, has a right to insist on the creditors being called in ; and their claims being proved, the partnership effects or their produce must be first applied in liquidation of such outstanding debts, before either partner can claim his share. It is immaterial therefore whether the petitioners have an adequate remedy at law or not ; for their equity is made effectual through the equity of the partners ; and the court must inquire into the validity of their claim, before the plaintiff can have any final decree in his favor on his bill. We see therefore no objection to the petitioners coming in by petition, for the purpose of proving their claim and receiving satisfaction from the funds in the hands of the receiver. It is admitted that a small part of the petitioners' debt originated during the life of the plaintiff's intestate, and now remains due ; and this is clearly a charge on the partnership funds. Whether the petitioners

have or have not lost their right of action against the plaintiff as administrator, is immaterial, and cannot affect the question of jurisdiction, or their claim on the partnership funds. The extent of that claim alone remains to be ascertained, in order to wind up this protracted and tedious suit; and it is desirable, and for the interest of all parties, that this should be done without any unnecessary expense and delay.

The petition of Bainbridge and Brown, and the answer thereto by Washburn as administrator of Tucker, with the other papers in the case, were referred to the master, in order that he might ascertain and report, among other things, the amount of money, if any, due to Bainbridge and Brown from the first firm of Goodman, Saville & Kent.

On March 19, 1832, the master reported, that in December 1823, the first firm purchased a quantity of racoon, bear and beaver skins, which were shipped to London, and consigned to Bainbridges & Brown. On May 8, 1824, before Tucker's decease, they shipped all the bear and beaver skins; on December 16, 1824, the surviving partners shipped a part of the racoon skins; and on April 16, 1825, the new firm shipped the rest of the racoon skins. An account of these shipments was kept in the books of the old firm. The bear and beaver skins were sold by Bainbridges & Brown, at the times and for the sums following.

| | |
|---|---:|
| 1824, Oct. 26, bear and beaver skins . . . . . . . . | $1055·23 |
| 1826, July 26, racoon skins . . . . . . . . . . . | 470·81 |
| 1827, Feb. 5, do. do. . . . . . . . . . . | 429·81 |
| | $1955.85 |

Bills of exchange were drawn on Bainbridges & Brown on account of these consignments, as follows:

| | |
|---|---:|
| 1824, May 10, by the old firm for £120 and £130 paid Aug. 17, 1824 . . . . . . . . . . . . . | $1111·11 |
| 1825, Jan. 28, by the new firm, for £225, paid May 5, 1825 . . . . . . . . . . . . . . . . | 1000·00 |
| 1825, May 21, by the new firm, for £650, paid Aug. 22, of which £250 is now charged by Bainbridge and Brown to the old firm . . . . . . . . . . | 1111·11 |
| | $3222·22 |

Bainbridges & Brown kept but one account of all their

Washburn
v.
Goodman.

dealings with the old and new firms. No evidence was offer-
ed that they did or did not know that Tucker was a copart-
ner of the old firm, or did or did not know of his death
previously to the first hearing in this cause. The letters to
them from Goodman, Saville & Kent contain no notice of
Tucker or of his decease. In the account of Bainbridges
& Brown annexed to their petition, there is no apportion-
ment of the bill for £650. The apportionment was made
by their counsel, in an account annexed to the report.

The proceeds of these several bills went into the funds
of the old firm, and appear by the books to have been ap-
plied to pay the debts of the old firm ; and Goodman, at a
former hearing, testified to the fact. The funds of the old
firm were not kept separate and distinct from those of the
survivors, who from time to time took moneys belonging to
the old firm, and charged it to themselves, and who, in the
same books, kept accounts of large money transactions, in
which it does not appear that Tucker's estate had an inter-
est. There was no evidence that J. Kent, administrator of
Tucker, did or did not object to the shipment of the skins,
or to the drawing of the bills of exchange.

The whole amount of bills now charged by Bainbridge
        and Brown to the old firm is £725 . . . . . . . $3222.22
Commissions, interest and charges of sale . . . . .    204.22
                                                      ———————
                                                       3426 44
The old firm is credited with the proceeds of the ship-
        ments as above stated . . . . . . . . . . . .  1955.85
                                                      ———————
Leaving a balance claimed by Bainbridge and Brown,
        March 6, 1827 . . . . . . . . . . . . . . .    1470.59
                                                      ———————
The bills sold before Tucker's decease amounted to . . 1111.11
The proceeds of skins shipped before his decease were  1055.23
                                                      ———————
Leaving a balance due Bainbridge and Brown, if the deal-
        ings of the parties had terminated here, of . . . . .  55.88
                                                      ———————
After Tucker's decease, and after the formation of the new
        firm, Goodman, Saville & Kent drew bills on Bain-
        bridges & Brown on account of the consignments, for  2111.11
They incurred liabilities for commissions, interest, &c. a
        part of which is chargeable to the balance of $55.88   204.22
Add that balance       . . . . . . . . . . . . . .      55.88
                                                      ———————
                                                       2371.21
They consigned skins purchased in the lifetime of Tucker
        and invoiced at $1329.68, which produced . . . .   901 62
                                                      ———————
Leaving a balance claimed wholly of the old firm, of . . $1470.59

The new firm, in 1825, made two shipments of skins to Bainbridge and Brown, other than those purchased by the old firm, the proceeds of which are credited in the account annexed to the petition.   In October 1825, they drew a bill for £450, which was paid.

The first transaction of the surviving partners with Bainbridges & Brown, was a shipment of skins, belonging to the old firm, to New York, thence to be transshipped to London. On December 16, 1824, they write to Bainbridges & Brown, that they had sent the skins to New York, and should probably draw for about $250 ; but in a subsequent letter of January 28, 1825, they write that "in consequence of having drawn for more than the net amount of sales of beaver and bear," they should draw for $225 only.   The skins had been actually shipped to Bainbridges & Brown, and according to the usual course of transmission, Bainbridge & Brown must have received the invoice and bill of lading, before the bill for $225 was presented for acceptance.

The master was of opinion, that the balance due from the old firm to Bainbridges & Brown, at the time of Tucker's decease, was $55·88, and that this balance was paid in the subsequent dealings of the surviving partners with Bainbridges & Brown, that the surviving partners had a right to ship the skins to London for sale, and that Tucker's estate was chargeable with his proportion of the loss on such shipments.

Bainbridge and Brown took several exceptions to this report ; among others, because the master was directed to report the amount of money, if any, due to Bainbridge and Brown, from the copartnership of Goodman, Saville & Kent, whereof Tucker was a partner ; nevertheless the master has limited his report to the expression of an opinion of the amount due at Tucker's death, although he states that the surviving partners had a right to ship the furs in question to London for sale, and did so ship the principal part of them, on which the loss happened, after Tucker's death, when by the exercise of such right on the part of the survivors and by drawing upon Bainbridges & Brown on account of the shipments and in advance of the sales, and applying the amount, in the course of the winding up of the partnership concerns, to the payment of

45 *

its debts, it appeared that the amount received from **Bain**
bridges & Brown, in the end, exceeded the proceeds of the
furs by the sum of $1470·59 ; whereas the master should have
reported that such excess, having gone to the use of the firm,
became a charge in equity on its funds, and should be paid
thereout before any distribution was had among the partners,
and that it was consequently money due from the partnership.

Bainbridge and Brown further excepted, because the master
should have reported, that as the name of the firm continued
the same after the death of Tucker as before, and as no notice
of his decease appeared in the letters of the survivors, Bain-
bridges & Brown had a right to presume that no change in the
partnership had taken place, and that the shipments and drafts
were on account of the persons constituting the firm at the
commencement of these transactions ; and consequently that
such persons and their legal representatives, concurring in
these acts, had a right to bind and in fact did thereby charge
the funds of the firm with the payment of the advances made
on the faith of the consignments, in the event which happened
of the proceeds of the sales falling short of the advances.

They further excepted, because the master has stated that
he is of opinion that the balance due to them from the old
firm at the time of Tucker's death was $55·88, and that this
balance was paid in the subsequent dealings of the surviving
partners with Bainbridges & Brown ; whereas he should have
reported that notwithstanding Bainbridges & Brown kept but
one account of the different shipments in question, the peti-
tioners had a right, upon being informed that these shipments
belonged to different concerns, to elect under the circum-
stances stated in the report, whether they would or would not
continue the credit as originally given, and having by their pe-
tition claimed to separate the different interests, that this was
a seasonable election, and well entitled them to withdraw the
same credit, and maintain their claim as if the proceeds of .he
subsequent shipments had not been originally.passed to :he
credit of the general account in their books.

*Fletcher* and *Aylwin*, in support of the exceptions, cited in
respect to the authority of the surviving partners after the
death of Tucker, *Ex parte Williams*, 11 Ves. 5 ; *Crawshay* v

*Maule*, 1 Wils. Ch. Rep. 191 ; *Crawshay* v. *Collins*, 2 Russell's Ch. R. 325, 342, 343 ; *Beak* v. *Beak*, 3 Swanst. 627 ; to the point, that it being the duty of surviving partners to wind up the concerns of the partnership, such new agreements as are necessary and are made by them without notice of the death of the other partner, will bind the common funds ; *Wilby* v. *Phinney*, ·5 Mass. R. 120 ; Pothier, Du Contr. de Sociùté, *c.* 9, *art.* , *No.* 155, 156 ; that the petitioners were entitled to be subrogated for the debts paid by their money, Domat's Civ. Law, *bk.* 3, *tit.* 4, § 4 ; *Walker* v. *Hill*, 17 Mass. R. 388 ; that the claim of Tucker's administrator is only an equity, and subject to all counter equities, *West* v. *Skip*, 1 Ves. sen. 239 ; *Fox* v. *Hanbury*, Cowp. 449 ; *Taylor* v. *Fields*, 4 Ves. 396 ; *S. C.* 15 Ves. 559, note ; *Case* v. *Abeel*, 1 Paige, 393 ; *Canfield* v. *Hard*, 6 Connect. R. 180 ; and that the appropriation in the books of the petitioners, of the proceeds of the furs, might be changed by them, having been made without knowledge of Tucker's death and not having been communicated to the opposite party, *Simson* v. *Ingham*, 2 Barn. & Cressw. 65, 72.

S. *Hubbard* and *Washburn*, *contrà*. The estate of Tucker, or his interest in the partnership funds, cannot be charged with a debt contracted by the surviving partners. *Fisher's exec.* v. *Tucker's exec.* 1 M'Cord's Ch. R. 169 ; *White* v. *Union Ins. Co.* 1 Nott & M'Cord, 557 ; *Kilgour* v. *Finlyson*, 1 H. Bl. 155 ; *Burrill* v. *Smith*, 7 Pick. 291. Any assent which Kent may have given to the transactions with the petitioners, was given by him as a partner ; he could not, as administrator, assent so as to bind Tucker's estate. The petitioners did not give credit to Tucker, for they did not know that he was a partner ; but even if they had known that fact, notice of his death was not necessary in order to prevent a new contract from operating on his estate. *Thacher* v. *Dinsmore*, 5 Mass. R 299 ; *Forster* v. *Fuller*, 6. Mass. R. 58 ; *Jones* v *Brewer*, 1 Pick. 314 ; *Pemberton* v. *Oakes*, 4 Russ. Ch. R. 154 ; *Newsome* v. *Coles*, 2 Campb. 617 ; *Hackley* v. *Patrick*, 3 Johns. R. 536 ; *Sanford* v. *Mickles*, 4 Johns R. 224 ; *Whitman* v. *Leonard*, 3 Pick. 177. Admitting that after the death of Tucker the surviving partners had a right to ship

Washburn
v.
Goodman.

the rest of the furs belonging to the old firm, they should not have drawn bills on account of them until they had received an account of the sales ; in which case no debt would have been created against the old firm. The balance of $55·88 was paid by the subsequent dealings of the petitioners with the surviving partners. *Tom* v. *Goodrich*, 2 Johns. R. 213 ; *Boston Hat Manufactory* v. *Messinger*, 2 Pick. 225 ; *Devaynes* v. *Noble*, 1 Meriv. 585 ; *Bodenham* v. *Purchas*, 2 Barn. & Ald. 39 ; *Pemberton* v. *Oakes*, 4 Russ. Ch. R. 154 : *Postmaster General* v. *Furber*, 4 Mason, 333. If the proceeds of shipments subsequent to Tucker's death went into the funds of the old firm, it was a matter only between the members of that firm ; it does not make these petitioner, creditors of the old firm.

*April* 1*st*,
183〔

WILDE J. delivered the opinion of the Court. The pe titioners have taken several exceptions to the report of the master, which, considering the facts reported, we think are well taken, and ought to be allowed.

It appears that before the death of Tucker a large quantity of racoon, bear and beaver skins were purchased by the old firm ; some of which were consigned to the petitioners for sale during the life of Tucker, and the residue after his decease by the surviving partners. Bills were drawn on account of these consignments, and the proceeds went into the funds of the old firm, and appear by the books to have been applied to pay the debts of that firm. After the death of Tucker the surviving partners continued to do business as usual (Kent having been appointed administrator on Tucker's estate), until January 1, 1825, when they formed a new copartnership under the same name, and took all the old stock, except the skins, to the amount of $18,609·31, and gave their notes to the old firm for the amount. It does not appear that John Kent the administrator ever objected to the shipment of the furs, or the drawing of the bills, as mentioned in the report of the master ; and his assent must be inferred, as he was an acting member of the firm, and the proceeds of the bills drawn were from time to time credited in the books of the firm to the " shipment of furs." On these and other facts stated in the master's report the petitioners claim to charge the assets of the old firm with the payment of the bills

drawn on the consignments, as well those drawn after as before the death of Tucker, so far as they were drawn on account of and for the use and benefit of the old firm. This claim appears to us to be well founded, and ought to be allowed. For although the partnership was in most respects dissolved by the death of Tucker, yet it was not to all intents and purposes dissolved by that event. A community of interest remained until their concerns were wound up. In the case of *Crawshay* v. *Collins*, 15 Ves. 218, it was held that after a dissolution of a copartnership the joint property may be used by the survivors for the benefit of all whose property it is, for the purpose of winding up engagements with third persons ; and a like principle is laid down in *Ex parte Williams*, 11 Ves. 5, and in the other cases cited by the counsel for the petitioners. In all such cases the survivors hold the partnership effects in trust until the same are distributed among the parties. And this distribution is not to be made until the partnership debts are paid. Now it is quite clear that the petitioners have an equitable claim on the old firm, for it appears by the master's report that the skins were purchased on account of the old firm, and were shipped on their account, consigned to the petitioners ; that bills were drawn on them upon the credit of these consignments ; and that the proceeds of these bills went into the hands of the old firm, and have been applied to the payment of their debts. This last fact alone is decisive of the case. *Qui sentit commodum sentire debet et onus.* · The petitioners stand on the footing of the creditors whose debts have been paid by the proceeds of these bills and are clothed with their rights. They have, therefore, a manifest claim in equity upon the funds of the old firm, and are not to be turned over to seek payment of their demand from the insolvent partners, upon whom too they have no equitable claim. For the surviving partners, after the death of Tucker, acted as trustees and agents of the old firm, and acting in this relation are not to be held responsible for their debts.

We are of opinion, therefore, that the master erred in rejecting the claim of the petitioners. That claim, as stated in the report of the master, with interest, is accordingly allowed,

deducting therefrom, however, the sum of $173·70, a balance in the hands of the petitioners belonging to the new firm, arising from shipments made by them, and which ought, we think, to be applied to the reduction of the claim against the old firm.

*Exceptions to the master's report as to the petitioners' claim allowed.*

NOTE. A final decree was passed on April 1, 1836.