## HOLDEN'S ADMINISTRATORS *v.* M'MAKIN.

The good-will of a newspaper is partnership property, and when one of the partners dies, it does not survive to the surviving partner. The surviving partner has the right to close up the partnership affairs, and has the sole right to dispose of the property; and it is his duty to wind up the whole business of the firm as soon as practicable after the death of one partner, and apply the proceeds of the concern first to the payment of debts, if there be any, and then the balance is to be divided between him and the legal representatives of the deceased partner.

If the surviving partner neglects or refuses to proceed within a reasonable time to close up the business of the firm and settle its concerns, a Court of Chancery will take the property out of his custody, and commit it to the care of a receiver, and direct him to make sale of the same.

In ordering a sale of partnership property, a Court will direct all the property to be sold, that which of a tangible, or even a speculative value, such as leasehold property, the subscription list of a newspaper, and the good-will of the partnership, so that its *value will be felt* and appreciated by all parties interested in the concern.

A partnership formed for conducting a newspaper, is commercial in its character, and the law applicable to trading or commercial transactions should be applied in adjudicating upon the rights of the parties.

An order for the issuing of an injunction and the appointment of a receiver on a motion for that purpose, and before a hearing on bill, answer, and proofs, is not a final decree, therefore no appeal lies from the decision of the Court of Common Pleas to the Supreme Court, under the Acts of 17th of March, and 16th of April, 1845. Those Acts give no appeal until after final decree.

The decree for an injunction is not a final, but an interlocutory decree, where the right of appeal is expressly prohibited by the Act of the 16th March, 1845.

There is no appeal from a decision of the Court of Common Pleas in cases in equity, except on a final decree. A decree which finally decides and disposes of the *whole merits* of the cause, and reserves no further questions or directions for the future judgment of the Court, so that it is not necessary to bring the cause again before the Court for its further decision, is a *final decree*. The issuing of a special injunction and appointing a receiver, is not a final decree.

*July* 8. THIS was a bill in equity praying for the sale of partnership property in a newspaper, the appointment of a receiver, and the decree of an account. The material parts of the bill and answer are so fully stated in the opinion given by the Court, on the application for an injunction and the appointment of a receiver, that a more full statement of the facts of the case, or the points in controversy, is deemed unnecessary to enable the reader clearly to comprehend the questions decided.

When the bill was first filed, and an injunction was asked for, the Court suggested that the defendant should file his answer before the application for the injunction was asked for. The answer was then put in. The cause was argued three times: first, on the

motion for an injunction; second, an application for an appeal from the order of the Court, awarding an injunction, and appointing a receiver; and lastly, upon bill, answer, and the proofs.

It was first heard before PARSONS, Judge, on the 17th of June, 1847, on a motion for an injunction and the appointment of a receiver.

The cause was argued by Messrs. *Gerhard, Barclay,* and *John Sergeant,* for the plaintiffs, and Messrs. *Guillou* and *Randall,* for the defendant.

It was argued by Mr. *Gerhard,* that the original purchase of the property by the parties was separate. Holden purchased a separate interest from Clark, and M'Makin from Woodward, the original proprietors; that it was treated by them as property consisting of separate and distinct shares; that both partners had treated for the good-will of this property as a separate and distinct interest; that, lastly, investments were made in this kind of property, and had been so made by these partners in the establishment; that having acquired an interest in the good-will and machinery of the paper, they went on to publish it.

He said Holden was a man of literary talents; that the success of the paper was, in a great measure, owing to his name and abilities; that after the death of Holden, his surviving partner continued to publish the paper in the name of the old firm, without any change, using the type, paper, ink, and the leasehold premises of the firm, to the 9th of May, 1846; and contended, that the administrators were entitled to the one-half of the profits down to the time of taking the account.

He then contended, first, that the good-will and subscription list of a paper, are articles of property which belong to the firm, and do not belong exclusively to the surviving partner; that these are now articles of trade, exchange, and investment; and if there was a dearth of decisions in England on this point, the fair argument was, that no surviving partner ever designed to inflict so great a wrong as was attempted here. He cited Wolworth *v.* Holt, 4 M. & C. 635; Spence's Equit. Juris. of Chan. 399; 1 Hoff. Chan. Rep. 68, 8 Vesey, 22; 4 Paige, 479; 17 Vesey, 338; 1 Sim. & Stew. 74; 15 Vesey, 127; Story on Part. 140. To show that newspapers are a species of property, he cited Aug. No. of the Boston Law Rep. 158.

In the second place, he contended, that whatever might be the doctrine relative to the good-will of property, in this case there was a lease of the property when the business was carried on, and

in this case there was a trust, which would take the case out of the general principle, in relation to the rule often applied to the good-will of an establishment: Story on Part. 389; 17 Vesey, 336; 2 Mad. Ch. Rep. 198; Gow on Part. ch. 2, §4, p. 107. That as there was a lease continuing from year to year, and the defendant having continued to use it, he must account to the representatives of the deceased partner for the one-half of the profits. That there were various pending subscriptions, and, the surviving partner going on to complete the contracts and receiving the money, the plaintiffs were entitled to one-half of the profits, for these could not be claimed by the defendant: See Curshaw v. Collins, 15 Vesey, 221.

Mr. *Barclay* supported the same points, and cited 5 Vesey, 539; the note to the case, 15 Vesey, 223.

Mr. *Guillou,* for the defendant, contended that the motion for the appointment of a receiver could not be sustained; that when the surviving partner is acting in good faith, the Court would not take the property out of his hands; that he was entitled to the possession of it for the purpose of winding up the affairs of the late firm; that in the present case the defendant had done his duty, and had paid over the one-half of the money collected, and was going on to close up the partnership affairs. Hence it was not such a case as would induce the Court to arrest his proceedings, especially as the defendant contended that the good-will of the paper survived to him; and cited 8 Vesey, 317; 1 Vernon, 118; 2 Anst. 453; 9 Paige, 178; 1 Swanst. 471.

In the second place, he contended that the good-will, the subscription list of a public newspaper, survived to the surviving partner, and belongs exclusively to his client; that the administrators of Holden had no claim to the same; that the good-will of a firm was the exclusive property of the survivor; and cited Collyer on Part. 80; 5 Vesey, 539; 7 Simons, 421; 10 Eng. C. L. Rep. 127; Fox v. Pearce, 3 Madd. 78; 3 Meriv. 441.

He also contended that this property in a literary newspaper was professional in its character, that the rule which applies to commercial transactions, could not be invoked in a case like the present; that the law was well settled that in cases of professional partnerships the good-will of the establishment belongs to the surviving partner, and the representatives of the deceased partner had no interest in it. He cited 17 Vesey, 335; 1 Rose, 123; 16 Amer. Jurist, 87; 8 Vesey, 215; M'Farlan v. Stewart, 2 Watts, 111. Therefore a Court of Chancery would not interfere by granting an injunction in a case like this.

He further contended that there was no injustice in the case; that, if a partner did not desire the good-will should survive, the effect thereof ought to have been provided for by the parties in their articles of partnership. That this was a partnership without articles, and one· that they knew could be determined at the will of either of the partners; and, therefore, there was nothing wrong in the assertion by the defendant to the good-will and subscription list of the paper: and cited Carey on Part. 288, 116; 3 Meriv. 614.

Mr. *Randall*, on the same side, said, the object of this application is the appointment of a receiver, who, if appointed, must go on and conduct the newspaper under the direction of the Court; a thing not very convenient to be done, and what the Court would not sanction; it was not a case for the appointment of a receiver. He cited Edw. on Rec. 156–7. That a receiver was not appointed except in cases of insolvency, or breach of trust. Here there was no pretence of insolvency, nor was there any breach of trust. True, the defendant had conducted the paper since the death of the other partner, and he had a perfect right so to do, for the good-will of the paper was his. That a newspaper is not an exception to the general rule, that the good-will of a partnership concern survived to the surviving partner. Mind is not the subject of barter or sale, nor can it be valued by figures.

He also contended that there was no implied trust, at the time of the purchase and formation of the partnership. There was no implied agreement designed by the parties, that the good-will should go to the representatives of the deceased partner.

He also contended, that, although the defendant had used the establishment since the death of Mr. Holden, the defendant was not bound to account for the profits thereof; for M'Makin had the right to have closed up the whole affairs, and discontinued the paper, the day after the death of Holden; and if he had continued it, the profits were his own.

These were the products of his own labour, and the defendants, as the representatives of the deceased partner, had no claim to any portion of them; that the place where the paper was published was not a leasehold property which gave to the plaintiffs any interest in the same.

Mr. *J. Sergeant*, for plaintiffs, in reply.—He contended that the Court had a perfect right to appoint a receiver, and order a sale of the whole partnership property of every description; that this was a proper case for the exercise of such an authority. The de-

fendant had kept the entire effects; he had made no disposition of any portion of them, but refused to do anything. He referred to a case in the Circuit Court, where Judge Washington once decreed the sale of a vessel, when one of the partners refused to use it or have it used.

He said this was a special partnership, where each of the partners had an equal moiety in the whole property which formed the partnership stock; that the good-will goes along with the other property belonging to the firm, and must be sold with it, and forms a part of the partnership property, to be distributed as the law requires. He cited M'Farlan v. Stewart, 2 Watts, 111; and said, I rely upon this case as settling the question in Pennsylvania. It decides that the good-will is an accessory to the purchase of the types and press, and is a part of the property. The right of a survivorship is but to sell and dispose of the whole property, tangible and untangible, out of the proceeds to pay the partnership debts, and the residue is to be divided among the partners, and the representatives of the deceased. Nothing survives to him but a legal right: 1 Hoffman Rep. 68. There was an implied trust in the original contract of partnership, that each should work for the other while the trust lasted; when it terminated, then the survivor held it for the payment of debts, and then the one moiety for the representatives of the deceased partner; and this is what the plaintiffs now claim.

The following opinion was delivered by

Parsons, Judge.—This case comes before the Court on an application for an injunction, and the appointment of a receiver; not for a final decree. True it is, the defendant has filed an answer to the bill, and on the filing of the answer it is, that the plaintiffs ask for these interlocutory orders.

The bill sets forth that a certain newspaper was published in this city, called the "Saturday Courier," by Woodward & Clark, which had a circulation of about 22,000 copies weekly, and in the spring of 1836 the interest of Clark was purchased by Ezra Holden, deceased, and that of Woodward by the defendant, when a partnership was formed between them, and from that time, until the death of said Holden, which happened about the 20th of March, 1846, said newspaper was published by them under the name of M'Makin & Holden as co-partners. All these facts are admitted by the answer, and the defendant admits that he paid $12,000 for the moiety which he purchased, and that Holden paid the amount set forth in the contract annexed to the bill, which shows that about

same or a larger amount was paid by the deceased for the half part which he purchased.

The bill also avers, that, while the co-partnership thus existed, the editorial department of the paper was conducted by Holden, who was possessed of literary abilities and character, and under his care the paper acquired a much greater reputation than it had ever before possessed; that its circulation increased, so that at the time of Holden's death, the number of copies of the paper circulated weekly, exceeded fifty-five thousand. That, at the time of the purchase by said Holden and the defendant, the value of the property consisted almost exclusively in the subscription list and good-will of the paper.

The defendant, in his answer, denies that the editorial department of the paper was conducted by said Holden, and that the increased reputation and circulation were attributable solely to his care. But the respondent does admit that his own attention was *not* solely devoted to that branch of the business, but says he had the entire charge and control of the financial affairs of the firm. It is admitted in the answer that Holden was possessed of literary abilities and character. Still it is denied that he is entitled to the credit for the editorial labours, or the literary reputation of the paper. It is also admitted by the answer that the weekly circulation of the paper at the time of Holden's death was upwards of 55,000. But the defendant denies that the value of the property purchased was almost exclusively the subscription list and good-will of the paper; but alleges, that, besides printing materials, there was an amount of outstanding claims of about $15,000.

The bill also charges, that, from the death of Holden to the present time, said defendant has published said paper, and has been in the possession and use of the press, types, paper, ink, printing materials, and other articles, the joint property of the firm; and that since the 16th of May, 1846, the defendant has issued said paper under its former name and title, as published by Andrew M'Makin, editor and proprietor, late M'Makin & Holden. This is also admitted by the answer.

It is also charged in the bill, that the defendant has collected large sums of money due the late firm, from debts outstanding at the death of the intestate, and that said defendant has been in possession of all the joint property belonging to the co-partnership, and has not accounted for the same. This is also admitted by the answer.

The bill also avers, that the administrators have repeatedly

called upon the respondent to purchase from him the interest of his deceased partner, in said newspaper, and materials belonging thereto; or, if he was unwilling to purchase the same, that the whole of the paper and printing establishment should be sold at auction to the highest bidder—the affairs of the late partnership be wound up, and the surplus divided between the defendant and the representatives of the deceased; but that said M'Makin has declined all those propositions. These averments in the bill are also admitted by the answer.

The bill then prays for an account of all the dealings and transactions between the partners, up to the time of said Holden's death; and of all since his decease, and the money received since then. The plaintiffs also pray that an injunction may issue, restraining said defendant from collecting any of the effects, debts, or moneys of the copartnership; and also, that a receiver may be appointed to take charge of, and collect the same; likewise, that the Court will decree a sale of the good-will of the co-partnership business, the subscription list of said paper, the leasehold premises, and all the goods, chattels, and effects of the same. There is also a prayer for general relief.

A decision of the main question involved in this application is of great importance to the parties to the bill, as well as the community at large; for it has rarely been presented in our Courts. The case has, therefore, been examined with much care and attention, and with an anxious desire to determine it upon the soundest principles of equity. No one who has examined the subject can deny that there is considerable difficulty on the question as it has been ruled by various adjudicated cases in the British Chancery Courts. I shall, therefore, examine the matter, first, on principle, and then, in relation to the authorities. It is, perhaps, well to remark, that in this case there were no articles of partnership between the parties; hence the partnership was determinable *at the will of either of the partners.*

For the purpose of more clearly elucidating the opinion which the Court have formed, it becomes important to refer to some elementary principles relative to the law of partnerships. I shall, therefore, in the first place, consider the legal rights of partners over partnership property while their connexion exists.

It should be borne in mind that partners differ from mere part owners of goods and chattels in many respects. It was once said by Lord Hardwicke, "partners themselves are clearly joint tenants in the stock and all effects;" but it has been said this language on

the point is not very correct, for partnerships differ from joint tenancy in two important particulars. In the first place, joint tenants cannot dispose of the interest of each other in the joint property, although they hold *per my et per tout*, but each has the sole power of disposing of his own interest therein; whereas, in cases of partnership, each partner is not only a joint owner with the others of the partnership property, but he also has full power to dispose of the entire right of all the partners therein, for the purposes of the partnership business, and in the name of the firm. In the next place, there is no survivorship in cases of partnership, as there is in joint tenancy. Therefore, we find it is observed by Lord Coke, in his remarks upon a passage from Littleton, in which "it is said that the right of survivorship shall hold between joint tenants, of things personal as well as real," that " an exception is to be made of two joint merchants, for the wares, merchandises, debts, or duties, that they have as joint merchants or partners, shall not survive, but shall go to the executors of him that deceaseth; and this is *per legem mercatoriam*, which is a part of the law of the realm :" Co. Litt. 182; Story on Part. 126; Collyer, 64. Hence it is clear that the analogies furnished from the law of joint tenancy, and tenancy in common, have no application relative to the rights or interests of partners. So also, from what has been shown as to the want of survivorship among partners, it follows, that, upon the decease of one of several partners, his share of the moveable stock and effects of the partnership, subject to the partnership debts, devolves on his personal representatives, who thereupon become, both at law and in equity, tenants in common with the surviving partners : Collyer on Part. 65.

It having been shown, by the principles above stated, that partnership property does not survive to the surviving partner, we will next inquire what are the rights of a surviving partner relative to the partnership effects, when a dissolution is caused by death, the insolvency or bankruptcy of one of the partners, or otherwise. Although it is said that, by the law merchant, the *jus accrescendi* does not take place among partners in trade, it must be understood to mean that it does not take place for the exclusive benefit of the survivor, as it does in a joint tenancy at the common law ; but the survivor holds the partnership effects as a trustee for the payment of the partnership debts existing at the time of the dissolution ; and the balance to be distributed equitably between the representatives of the deceased partners and the survivor : Collyer on Part. 64. On this point it was said by Chancellor Walworth, in Case *v.* Abeel, 1 Paige,

2 A

398 : " The surviving partner has the legal right to the partner-
ship effects ; but in equity he is considered merely as a trustee to
pay the partnership debts, and dispose of the effects of the concern,
for the benefit of himself and the estate of his deceased partner.
He cannot therefore be permitted to make gain or profit by the use
of the partnership funds and effects for his own exclusive benefit :
Egbert v. Wood, 4 Paige, 517.   Hence it follows, from the above
rule, that although, as to future dealings, the partnership is termi-
nated by the death of one partner, yet for some purposes it may be
said to subsist ; and the rights, duties, powers, and authority of the
survivor remain, so far as is necessary to enable him to wind up
and settle the affairs of the partnership : Story on Part. 492, § 344.
Therefore all *choses in action*, debts, and other rights of action, be-
long to the surviving partner ; and he possesses the sole and exclu-
sive right and remedy to reduce them to possession ; although, when
so recovered, the survivor is regarded as a trustee thereof for the
benefit of the partnership, and the representatives of the deceased
partner possess in equity the same right of sharing and participa-
ting in them, which the deceased partner would have possessed, if he
had been living : Story on Part. 394, § 346 ; Gow on Part. 376.

If such are the rights, power, and authority of the surviving part-
ner, it becomes important next to ascertain what are his duties,
and the obligations imposed upon him relative to the partnership
property, its disposition, and the manner in which he should wind
up the concern.

It is undoubtedly his duty at once to make sale of all the part-
nership property of every kind, as it was held by the partners at the
time of the death of the deceased partner, or of a dissolution caused
by bankruptcy, insolvency, or otherwise ; collect all the outstanding
demands in favour of the firm, pay off the partnership debts, and
divide the balance with the representatives of the deceased.   Courts
of Equity are constantly in the habit of decreeing a sale of partner-
ship stock, in all cases of *partnerships at will;* that being con-
sidered the most equitable dealing with the interests of all *parties:*
Collyer on Part. 167 ; Crawshay v. Collins, 15 Vesey, 128 ; 1
Swanst. 495.   And so far was this doctrine carried, that, in the
case of Wilson v. Greenwood, 1 Swanst. 471, where there was a
special proviso in the articles of partnership, as to the assignment
of each partner's share, upon death, retirement, or bankruptcy of
one of the partners, a sale was decreed, because it was found
impracticable, if not illegal, to act upon the proviso.

And we find it laid down as a general principle, that, in all cases

of a partnership at will, whether the contract was originally of that nature, or has become so by effluxion of time or other circumstances, a Court of Equity will, upon dissolution, decree a sale of the entirety of the partnership effects, at the desire of any of the parties : Collyer on Part. 169.

Therefore it is said by Judge Story, " It becomes the duty of all the parties in interest, upon a dissolution by death, with all practicable diligence to wind up and settle the partnership concerns, to pay the partnership debts, and to distribute the surplus among those who are entitled to it, according to their respective shares therein ; and in case of delay, or danger of loss, or neglect of duty to require the aid of a Court of Equity to enforce the duty, and to compel a full account and settlement of the whole concern. Hence, the personal representatives of the deceased partner have a right to insist upon the application of the joint property in the hands of the survivors to the payment of the joint debts, and a division of the surplus :" Story on Part. 495–6 ; 6 Vesey, 126 ; Gow on Part. 378. And this rule seems to be based upon very substantial grounds, for the rights of the partners as to the property are precisely equal ; each may require the whole concern to be wound up by a sale, and a division of the produce. One partner has no claim upon his individual proportion of the specific articles, nor can he insist upon an exclusive right in it; but he is entitled only to a general arrangement of the partnership concerns, and for that purpose to an account of the produce of the aggregate joint effects. He cannot separate his share from the bulk of the joint property, nor compel his co-partner to accept what, according to a valuation, his interest may be worth. Such is not the method adopted by a Court of Equity, when it winds up the concerns of a partnership. But in every such case, where the Court interferes in closing the transactions of a firm, it directs the value of *the whole* of the joint property to be ascertained in the best possible way, viz. by a sale, and its conversion into money: 3 Kent Com. § 43, p. 64 ; 1 Tamlyn's R. 261 ; Gow on Part. 235.

It necessarily follows, from a statement of these principles, that it was the duty of this defendant, as soon as practicable after the death of Holden, to have sold *all* the partnership property, converted it into money, paid the debts of the firm, and divided the surplus between the representatives of the deceased and himself. I presume the question will be asked, what does the law require him to sell ? I answer, all the partnership property, all the interest that M'Makin & Holden both had in the " Saturday Courier" at the

time of the decease of the latter; all their interests in the concern that were of any real or speculative value. Probably the question will be asked, what property would the purchaser obtain by a sale thus made? This question, I consider, is best answered by a decision of our Supreme Court, in the case of M'Farlan *v.* Stewart, 2 Watts, 111, where the contents of a printing office were sold on an execution by the sheriff, along with the types, presses, &c., when it was held that the subscription list was not the subject of separate property, but passed as an accessary of the principal sold by virtue of the execution. In that case the Chief Justice uses this language: "Undoubtedly the custom or business of one established in an occupation, may enable him to sell the tools or implements of a trade for a price beyond their intrinsic value; and this holds in an especial manner in regard to the subscription list of a newspaper, to which a purchaser succeeds as a part of the establishment."

But it has been contended by the counsel for the defendant, that the " good-will" of the establishment, as it has been styled in the argument, by which I understand them to mean the subscription list, as well as the right to publish the paper under its present title, belongs to him; that he took this legally, as the surviving partner; and if a Court of Equity should decree a sale of the partnership property, it would only be of the types, presses, materials in the printing office, &c., because the incidents to it are the sole property of him the survivor. But in my opinion, this is a position which cannot be sustained to the extent it has here been contended, either by authority, or as consistent with the sound legal principles which control partnership property.

We will first examine this question on authority. It was held by the Vice-Chancellor of New York, 1 Hoffman R. 68, that the good-will of a trade does not survive, but is partnership property. And he actually decreed a sale of leasehold property, and in his opinion observes: "Then is a lease plainly partnership property, to which the good-will certainly attaches. Upon a sale, the good-will, of course, enters into the value of the lease, and enhances the purchase-money. In truth, in a lease of a trading establishment, it constitutes a large part of the value." In Case *v.* Abeel, before cited, 1 Paige, 401, the Chancellor, in directing an account to be taken by a Master of the property of a deceased partner, in the hands of the survivor, and also the executor, ordered a valuation to be taken of *the good-will* of the business; and this was of a hardware store, where the deceased partner had been dead for more

than twelve years.   In the case of Marten *v.* Van Schaik, 4 Paige, 479, which was a bill to compel a dissolution of the partnership, and to settle the accounts, it was decreed that a receiver must be appointed, and that he must take the charge of a public newspaper, and carry on the business so that *the good-will* might be secured to the purchaser.   Hence, I think it clear, from the view taken by the Court of Chancery in New York, that in commercial transactions the good-will of a mercantile establishment does not survive in case of a dissolution of a partnership by death or otherwise.

And so far was the doctrine carried by Judge Sutherland, in the case of Allen *v.* Blanchard, 9 Cowen, 632, that he says, " the custom or law of merchants excluding survivorships, extends to all traders;" and applies it without any qualification in the case of two partners who were practising physicians, and remarks generally, " Whenever there is a joint undertaking in the way of trade, the *jus accrescendi* has no application."   But the question of good-will was not then directly before the Court, or, perhaps, the rule might have been qualified in that particular, as it was a case of professional partnership.   For it is said by Judge Story : " It seems, that good-will can constitute a part of the partnership effects or interests, only in cases of commercial trade or business; and not in cases of professional business, which is almost necessarily connected with personal skill and confidence in the particular partner:" Story on Part. 142.

Whatever may have once been considered the law in England on this point, it seems to be pretty well settled now, that in commercial transactions the good-will does not survive, on the death or bankruptcy of one of the partners, while probably in professional partnerships it does.   True it is, that Lord Rosslyn ruled, in the case of Hammond *v.* Douglass, 5 Vesey, 539, that the good-will of a trade, carried on without articles, did survive.   Subsequently, the subject was considered by Lord Eldon in the case of Crawshay *v.* Collins, 15 Vesey, 539, and ruled that when partners become bankrupts, *the good-will* of their trade passes to their assignees ; and in remarking upon the case of Hammond *v.* Douglass, he observes, " If the surviving partners think proper to make that which in equity is the joint property of the deceased and them, the foundation and plant of increased profit, if they do not think proper to settle with the executor, and put an end to the concern, they must be understood to proceed upon the principle which regulated the property before the death of the partner."   In the case of Farr *v.* Pearce, 3 Madd., Sir J. Leach says, that partnerships between professional

36                              T 2

men are different from commercial partnerships; in the former he thinks the survivor cannot be affected by the death of his co-partner. And Gow, in his Treatise on Partnerships, thinks there is an intelligible distinction between commercial and professional partnerships on this question (Gow on Part. 377); a distinction which is not necessary now to consider, as it will be presently shown that the present case must be treated as commercial in its character.

In order to understand in what cases the good-will does not survive, it may be well accurately to define the meaning of this term. Mr. Justice Story says: "Good-will may be properly enough described to be the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from accidental circumstances, or necessities, or even from ancient partialities or prejudices. Thus, an inn, a nursery of trees, and shrubs, a favourite fashionable stand, *or a newspaper establishment*, may, and often does, enjoy a reputation, and command a price beyond the intrinsic value of the property invested therein, from the custom which it has obtained and secured for a long time; and this is called the *good-will* of the establishment; Cuttwell *v.* Lye, 17 Vesey, 336. Lord Eldon on one occasion said that a good-will of this sort was nothing more than the probability that the old customers will resort to the old place.

It is a general remark, that this is not a tangible interest, upon which a definite or fixed value can be placed. Therefore, *it is not*, strictly speaking, a part of the partnership effects, of which, upon a dissolution thereof, a division can be compelled, except in cases where a sale of the whole premises and stock is ordered; and then the good-will must accompany such sale, and may create a speculative value in the mind of the purchaser, of which each partner will be entitled to his share and benefit: Cuttwell *v.* Lye, 1 Rose, 123; Story on Part. 140.

Such being the law, it clearly demonstrates two important points in this cause: first, that a partnership formed for conducting a newspaper, like the one presented in the bill, is commercial in its nature, and the law applicable to commercial or trading transactions should be adopted in adjudicating upon the rights of the parties; secondly, that the defendant is not entitled to the good-will, subscription list, speculative value, or call it by what name

you please, of the paper published by him and the deceased, but it is partnership property, which the law demands should be sold along with the partnership effects, and the proceeds to be divided according to the rules which govern in the distribution of all other property which belonged to the partners at the time of the dissolution, caused by the death of Holden.

Other authorities may be cited to the same point.   Hence it is said by Collyer, in his Treatise on Partnerships, "It is not a tangible interest, or a commodity on which a specific value can be placed. Therefore, upon the death of one partner, it is not stock of which an executor of a deceased partner can compel a division, unless he can compel a sale of the whole premises and stock, as in the case of a partnership at will.   Under such circumstances, however, the good-will would accompany the rest of the stock, and might create some additional speculative value in the mind of a purchaser.   Accordingly, a Court of Equity, in this and similar cases, would so treat it, that its value should be felt and appreciated by all parties interested in the concern; and therefore, in decreeing a sale of the entire partnership, would order the sale to be so adjusted as will give full effect to the value of *the good-will.*"   Collyer, 80.

We have shown that the partnership in this case was one *at will,* and that it was a case where a Court would decree a sale when the surviving partner neglects or refuses to make one, and wind up the concern.   Therefore, on authority, to my mind, the case is clear of doubt or difficulty, and I think it can be shown by one or two illustrations that these principles are based upon those substantial grounds which ought always to regulate the rights of property in this country.

Suppose that at the the time of Holden's death the firm had been indebted to the amount of $30,000, and M'Makin had sold the "Saturday Courier," with the subscription list, good-will, and materials, for that sum, taken the money and paid the debts, and then had filed his bill in chancery against the administrators of Holden, alleging that the types, press, &c., were not worth more than $10,000, and claiming that all the purchase-money over and above that sum was his own property by right of survivorship, and praying that the estate of his deceased partner should make contribution to him for the one-half of the $20,000 over and above the real intrinsic value of the printing materials; is there a Court of Equity in the Union that would entertain such a bill? or if, before we had a Court clothed with chancery powers in this state, he had brought his action in a common-law Court for so much money

paid, laid out, and expended, is there a jury in Pennsylvania that would give him a verdict? I think it would be difficult to find such a one. Or take another view: suppose the defendant had sold out the whole establishment immediately on the death of Holden (as he was bound to do), for $30,000, and there were no debts, and have paid over but $5,000 to the administrators of the deceased, alleging that was one-half of the real value of the materials in the office, and had kept the other $20,000 himself, and this was a bill calling upon him to account for that sum, with these authorities which I have cited before the Court; could there be any hesitation in the mind of any judge wishing to mete out justice, in decreeing that the defendant should pay over the one-half of that amount? I can only say that nothing short of a positive Act of Assembly, or a solemn decision of the Supreme Court on the very point, which I should feel bound to regard, would prevent me from making such a decree. In the present condition of affairs, I can find no decision in this state which militates against the opinion above indicated. On the contrary, I conceive the case of M'Farlan v. Stewart goes far on principle to support it.

These principles being established, it becomes important to decide what control a Court of Equity can exercise over the partnership property, when a surviving partner has not performed those duties which the law enjoins upon him in relation thereto. It has already been remarked that the Court can order a sale of all the partnership property, and will do it when a proper case is presented. It will also direct an injunction to issue, restraining the survivor from any farther control over the estate, and appoint a receiver to take the possession of the entire property, when the interests of the estate of the deceased partner demand it: Collyer on Part. 197–8; Gow on Part. 382; Banks v. Scott, 5 Madd. 493; Phillips v. Atkinson, 2 Bro. C. C. 272; Hartz v. Schrader, 8 Vesey, 317.

The rule laid down by Courts of Equity on this subject seems to be this: the surviving partner having, at law, the right to the care, custody, and management of the joint estate, a Court of Equity will not, generally speaking, on a bill being filed against him for an account of the partnership transactions, deprive him of his legal right by appointing a receiver, because, notwithstanding the death of one, the confidence in the other remains. But, if he be guilty of such acts of mismanagement and improper conduct as satisfactorily prove that he cannot be intrusted with the joint estate, the Court will then exercise its power, and appoint a receiver to collect in the debts and dispose of the property: Gow on Part. 382.

" Or, if there is a breach of moral obligation, or if he, in any respect, behave *unrighteously* against the interest of the deceased partner, or the representatives of a deceased partner:" Collyer on Part. 197.   Or, in the language of Judge Story, "in case of any improper delay," the aid of a Court of Equity may be invoked:" Story on Part. 496.   So, where either partner has a right to dissolve the partnership, and the agreement between the parties makes no provision for closing up the concern, it is a matter of course to appoint a manager or receiver, on a bill filed for that purpose, if they cannot arrange the matter between themselves: Law *v.* Paige, 310. And the same rule prevails *respecting the appointment of a receiver in a suit between the representatives of a deceased partner and the survivor:* Edw. on Rec. 137; Collyer on Part. 197.

But it has been contended by the counsel for the defendant, that, because he has said in his answer that although " true it is the plaintiffs have proposed a sale of the partnership property, but as he is satisfied with his business, and sees no reason why he should incur any risk consequent on the sale," therefore it would be unjust that one should be ordered by the Court.

It is probably sufficient to remark on this, that the Court must presume that the defendant knew the law when the partnership was formed, and if he wished to guard against the legal effects of the dissolution of a partnership at will by the death of his co-partner, it was his duty to have provided against the consequences which flow from such a state of things by articles of partnership, while the other partner was in full life.   He having failed to do so, we must apply the principles of the law to each case as we find it.

It now only remains for the Court to determine what must be done in the present case.   It is to be remembered that Mr. Holden has been dead more than fourteen months, and it does not appear that the defendant has done anything towards closing up their partnership affairs, but on the contrary has gone on and used the partnership property to the present time.   In Pennsylvania, our Act of Assembly gives one year to an executor or administrator to settle the affairs of a deceased individual; and from analogy to such a provision in the law, and the practice in the Orphans' Court, I think it would be a safe rule to adopt in equity, when a surviving partner is required to settle the affairs of partnership concerns. An assignee or trustee, and even a guardian, can be required to settle his account at the expiration of a year ; and we have clearly shown that a surviving partner is but a *trustee* for the creditors and the representatives of a deceased partner.

I, therefore, think this defendant ought to have sold the property within the year, and settled up the affairs of the concern, or shown by his answer some good cause why he has not done so. But failing to do any such thing, nor having shown that he has taken any steps towards it, I think, in the language of the law, there has been "that improper delay" which justifies the plaintiffs in demanding the aid of a Court of Equity. I do not wish to be understood as charging the defendant with any bad conduct in the transaction, but am inclined to attribute this delay to a mistaken apprehension of his own, and the legal rights of the representatives of his deceased partner. Still, it is only for the Court to apply the remedy given by the law, when the acts of any one, although proceeding from good motives, render him liable to its provisions. Therefore, under all the facts disclosed before us by the bill and answer, I shall feel it to be my duty to award an injunction, restraining the defendant from exercising any further control over the partnership property, if it should ultimately be insisted upon ; and also to appoint a receiver to take the possession of the entire property, with directions to him to make sale of all the partnership effects as soon as practicable, without doing injury to the rights of the parties interested. In so deciding, it necessarily follows a Master must also be appointed, to take an account of the property, and report to the Court as to the same ; so that the receiver may be held responsible for what shall come into his hands, in order that the money may be safely secured until after a final hearing of the cause, when the Court can make such a decree on the respective rights of the parties, as shall be deemed in accordance with the settled rules of equity.

After the preceding opinion was delivered, a settlement was proposed between the parties, but not consummated, when a decree was prepared by the plaintiffs' counsel, ordering that an injunction should issue restraining the defendant from exercising any further control over the partnership property, and an order for the appointment of a receiver, with a direction to the defendant to surrender up to that officer all the partnership property. The entry of this decree was for some time postponed, the parties continually endeavouring to effect a settlement, when, on the 18th of September, 1847, the Court made the decree and appointed a receiver. After he had given bail and taken possession of the property, the receiver reported to the Court that such was the nature and character of the property, it consisting mainly of the good-will and subscrip-

tion list of the newspaper referred to in the bill, in his opinion it would be for the interest of all the parties concerned, that the whole establishment should be sold ; that it was of that ephemeral nature if continued in its present condition until after a final decree, it might be of but little value.   The sale was resisted by the counsel for the defendant ; but after argument and a full consideration of the case, the Court made an order that the receiver should sell the printing press, types, and fixtures, together with the good-will and subscription list of the *Saturday Courier* at public auction, on a day designated in the order.

After this the counsel for the defendant came into Court, and tendered an appeal from the interlocutory decree of the Court in awarding an injunction and appointing a receiver.   The right to appeal at this stage of the proceedings in the cause was resisted by the counsel for the plaintiffs, and after a full argument by the same counsel before the same Judge, the appeal was refused ; and on the 19th of October, the following opinion on the right of appeal from the previous orders was delivered by

. PARSONS, Judge.——This case now comes before us on an application by the defendants for an appeal to the Supreme Court, from a decree rendered by this Court, ordering that an injunction be issued, and appointing a receiver to take charge of the parnership effects.   The question as to the defendant's right to an appeal, depends entirely upon the provisions of our Acts of Assembly.   On the 17th of March, 1845, an Act was passed, providing that in all suits in equity then pending, or afterwards to be instituted in the Court of Common Pleas of the County of Philadelphia, any person who was affected by any interlocutory or final order or decree in such suit in equity, should be entitled to appeal therefrom to the Supreme Court, &c.   On the 16th of April, of the same year, and at the same session, another Act was passed, providing that so much of the former Act " as allows and provides for appeals from interlocutory orders or decrees of the said Court of Common Pleas, be, and the same is hereby repealed."   From the reading of these two laws it is manifest that no appeal lies from the decision of this Court, except upon a *final* order or decree. Therefore, the only point for our determination is, whether the order of the Court already made is *final* or *interlocutory*.   In order properly to understand this question, it becomes important to inquire what was prayed for in the bill, and what was presented on

the whole record for the ultimate adjudication of the Court? Then to inquire what has been decided?

The bill, in the first place, alleges a partnership between the plaintiffs' intestate and the defendant; it prays for an account of all the joint dealings and transactions between the defendant and the intestate.

It is also alleged in the bill, that, since the decease of Holden, the defendant has gone on and used all the partnership property and effects of the late firm, and a prayer that the defendant be decreed to account for what he has made during that period, and that he pay over to the plaintiffs what shall appear to be due, on taking an account of what was the indebtedness before the death of the intestate, as well as the profits since. There is also a prayer for an injunction, and the appointment of a receiver; and also, in an amendment to the bill, a prayer for a sale of the partnership effects of the late firm, and their co-partnership effects in a literary newspaper called the "Saturday Courier." An answer was filed to the bill and the amendment. After that, a motion was made for an injunction, and the appointment of a receiver.

This was argued before the Court, when an opinion was delivered deciding that there had been such an unreasonable and improper delay on the part of the defendant, the surviving partner, in closing up the affairs of the late firm, that the plaintiffs had a right to invoke the aid of a Court of Equity in their behalf to compel a settlement of the estate. This decision was made in the early part of June last; and on the 18th of September, the Court appointed a receiver and awarded an injunction against the defendant. Subsequently, on a report by the receiver, an order was made for a sale of the partnership effects of the late firm. Therefore the only question for our adjudication seems to be, whether this decree is *interlocutory* or *final?*

What then is an interlocutory judgment or decree? or rather, what is a final judgment or decree? for it is only from such that an appeal lies.

Blackstone says, "Interlocutory judgments are such as are given in the middle of a cause, upon some plea, or proceeding, or default, which is only intermediate, and does not finally determine or complete the suit." "And the interlocutory *judgments* most usually spoken of are those incomplete judgments whereby the right of the plaintiff is, indeed, established, but the *quantum* of damages sustained by him is not ascertained:" 3 Blac. 396. And the elementary writers in equity speak of *interlocutory decrees* in almost the

same language. Daniels, in his Practice, 631, says, "An interlocutory decree is when the consideration of the particular question to be determined, or of further directions generally, is reserved till a future hearing. It very seldom happens that a first decree can be final, or conclude the cause." So, likewise, it is said, "In strictness, a decree is interlocutory until it is signed and enrolled, but the term is more generally applied to decrees in which some inquiry as to matter, either of law or of fact, is directed preparatory to a final decision :" 1 Newl. 322.

"Final judgments are such as at once put an end to the action, by declaring that the plaintiff has either entitled himself, or has not, to recover the remedy he sues for :" 3 Blac. 398. "When a decree does not reserve the consideration of the points of equity arising upon the determination of the legal rights of the parties, or of the further directions consequent upon the Master's report or the costs of the suit, it is said to be a *final decree :*" 2 Danl. 638. We find it ruled in the case of Wills *v.* Hoag, 7 Paige, 18, "a decree which finally decides and disposes of the whole merits of the cause, and reserves no further questions or directions for the future judgment of the Court, so that it will not be necessary to bring the cause again before the Court for its further decision, is a *final decree.*"

Can then the mere appointment of a receiver and the issuing of a special injunction be called a *final decree,* within the strict rules laid down by the best elementary writers and the most eminent chancellors? Is there not something more to be done? Is there not something reserved, some future equity for the action of this Court? Most clearly, there is. We shall be called upon to decree an account, and also decree whether the defendant shall account for all the profit he has made by the publication of the paper since the decease of Holden, or not. We shall also be required to decree a distribution of the proceeds of the sale of the partnership property which may be sold by the receiver. True it is, we have settled one important principle in this cause in deciding what shall be sold as partnership property; but such, I apprehend, is always the result of an adjudication on most of the questions that arise on a motion for an interlocutory order, in the progress of a cause in a Court of Equity. Hence it is apparent, if we regard the technical definitions of *interlocutory* and *final* judgments or decrees, the decree already made is but *interlocutory,* and not *final,* and it is only from the latter that appeals are allowed.

But, if we divest the subject of its technical character, we shall find that a decree for the appointment of a receiver or injunction

37　　　　　2 B

is one of common use in equity practice, most generally adopted in dissolving partnerships, and in closing up partnership concerns, and has always been considered but an interlocutory order. It is a decree that can be pronounced before an answer has been filed, after the defendant has been served with a subpœna, on the affidavit of the plaintiff, whenever it is clear to the mind of the Chancellor that equity demands it. And in all such cases the decree or order is called an *interlocutory* one: 2 Russell, 52. And the great and leading principle which must control me in the determination of this point, I conceive has been already settled by this Court, in a clear and masterly opinion delivered by the President Judge in the case of Gowan *v.* Jeffries, 2 Ashe, 305.

That was a bill filed, praying for a dissolution of a partnership. On the filing of the bill and special affidavit, an injunction was granted by the Court. Subsequently a motion was made for the appointment of a receiver, which was fully argued by able counsel.

In that case the Court appointed a receiver on the mere motion of the plaintiffs, upon satisfactory affidavits being produced; and in his opinion, the learned Judge treats such a decree as interlocutory and not final. The quotation of a few of his remarks, I think, will settle the principle satisfactorily to the mind of every one, that the question now before me is decided. He remarks: "This is the case of an application for a receiver, on a bill filed for the dissolution of a subsisting partnership, and made before answer and *final decree.* Such a case, to authorize the appointment of a receiver, must be one which would authorize a decree for a dissolution; and when it is apparent, that a dissolution will be decreed on the ground of some breach of duty, or contract, a receiver will be appointed." A number of authorities are cited to sustain this position, and, after quoting the rule as laid down by Lord Eldon, he proceeds and says: "Now, applying this plain and practical principle to the case before us, it seems to us to be a case in which a dissolution must be decreed, judging as far as we are able from the affidavits and exhibits. Ultimately, and on the *final hearing*, it is possible that by the aid of new lights, and even better advice and consideration of the proof now before us, we may be of a different opinion. But, if such a possibility is to prevent the action of the Court on this motion, then the case of a receiver, on a dissolution bill, before final decree, can scarcely be imagined; for I can hardly suppose a case, merely resting on conflicting evidence, in which a judicial tribunal might not be convinced, on a *full and final hearing*, of the propriety of abandoning an inceptive impres-

sion formed on an *interlocutory* hearing." It seems to me that no one would contend that on a bill for the dissolution of a partnership, the decree appointing a receiver was a *final decree.* It is settled otherwise by this Court, and I have no disposition to change their decision. And I apprehend that it is difficult to distinguish the case cited from the present. The principle which applies in the one must necessarily in the other.

With this well-defined distinction between *interlocutory* and *final* decrees, as settled by this Court, before the legislature, they pass an Act authorizing appeals only from *final* decrees. We also find, by a reference to other authorities, that the same rules which govern Courts of Equity on a bill for the dissolution of a partnership, control their action when it is dissolved by the death of one of the partners. The case of Crawshay *v.* Maul, 1 Swanst. 502, is full to the point. That was a bill filed by the executors of a deceased partner, praying for the sale of a large iron establishment, and to terminate the trading, as well as praying for an account. In that case the Lord Chancellor held, that the Court would direct a sale of partnership property on motion, and, if necessary, appoint a manager to wind up the concern, and direct inquiries in what manner it could be wound up most beneficially to those interested This is his language: "Then comes the question, can the Court, in such a case, direct a sale by interlocutory order on motion. I have considered that question much, and I think that the Court not only can, but in many instances does order a sale on motion, in the instance of a trading partnership actually dissolved:" page 523; and in that case a sale was ordered before a *final* hearing was had: 13 Vesey, 266; Ib. 104.

The same rule is recognised as controlling the winding up of partnership concerns dissolved by death in this country. Therefore we are told by Mr. Justice Story, in his Treatise on the Law of Partnerships, p. 496, that the personal representatives of the deceased partner have a right to insist upon the application of the joint property in the hands of the survivors, to the payment of the joint debts, and a division of the surplus. And if, within a reasonable time, the survivors do not account with them, and come to a settlement, a Court of Equity will entertain a bill for this purpose. And in aid thereof, if necessary, restrain the partners by injunction from disposing of the property, &c. Now, in the present case, the Court have done the same; and it is in aid of the bill, and not a *final* hearing or decree thereon.

Mr. Bell, in the 2d edition of his Commentaries, B. 7, ch. 2, p.

645, sums up the general results of the dissolution of a partnership, whether by death or otherwise; and then proceeds and states what property shall be considered common stock for distribution, and says, that "The good-will of a mercantile, or literary establishment, seems to form a part of the common stock." And says, that "either of the partners may insist upon a sale as the best criterion of the value of the property; and this the Court may order without waiting the *final adjustment* of interests, where it is manifest that there must be a dissolution:" Story on Part. 497; 1 Ves. 180.

I have thus referred to a number of authorities for the purpose of establishing the point, that the decree from which the defendant seeks to appeal is not a final one; and that the opinion of this Court in the case of Gowan *v.* Jeffries, is based upon the highest authority, therefore there is no occasion for its reconsideration.

But it has been contended by the defendant's counsel, that, on this motion for the appointment of a receiver, we have decided a point of vital importance against their client, and its effects may be disastrous to him in case there is error in the decision. If such is the result, it is the fault of the law, and not of the Court. The legislature have spoken in a language as emphatic as if they had said, "There shall be no appeal in equity, except from a *final decree* after a hearing of the whole cause."

When the Act of the 16th of April was passed, we must presume the legislature knew full well the difference between *final* and *interlocutory* decrees, and the effect of each. In the most ordinary case of partnerships, a decision on the motion for the appointment of a receiver may decide the main question in controversy. If, for instance, a bill is filed for a dissolution of a partnership, a motion, before or after answer filed, is made for an injunction and the appointment of a receiver. And if the defendant should contend there was no partnership; yet from an examination of the articles the Court should be convinced that there was a partnership; is not the main question in the cause determined? Or suppose the defendant should admit that a partnership existed as to a store in the city, but denied in his answer that it embraced a number of vessels engaged in the coasting trade; but the opinion of the Court was that the partnership extended to both; therefore a receiver is appointed, and injunction awarded, and the officer of the law directed to sell the ships as the best method of closing up the concern. The main question in controversy (to wit) the extent of the partnership dealings, is decided on the interlocutory motion for an injunction, and yet we have seen there is no appeal, simply because

the law does not authorize it.   So in actions of partition, no writ of error could be taken until after final judgment (until provision was made therefor within the last five years by Act of Assembly). On the plea of *non tenet insimul* to such an action, the main point in controversy between the parties is decided on the first trial; and although there was a solemn hearing between the parties before a jury, yet it was settled in 1818, in the case of Power *v.* Lockhart, that a writ of error would not lie to the first judgment, that of *quod partitio fiat*; and in that very case the writ *de partitione faciendi* was not issued until 1834, when, on error in the Supreme Court, the first judgment was reversed: see 2 Watts, 371.   And it is a general rule that a writ of error will not lie to an interlocutory judgment in a Court of law.

The defendant's counsel, to sustain their position, have relied upon Hess's Appeal, 1 Watts, 255.   But the appeal in that case was allowed under the Act of the 27th March, 1713, entirely different from the law of 1845; and moreover, in that case the decree was final or definitive, and the learned judge puts the case upon the ground that nothing remained to be done but to execute the decree of the Court.   But the case before us is manifestly different; there is much more to be done before this case can be finally decided.   If we should allow the appeal, and the cause should be heard by the Supreme Court, and our judgment affirmed, what then would be done with it ?   It is only on reversals that the record is remitted to us for further action.   How then are the plaintiffs to get a decree for their money ?   Is the Supreme Court to proceed and hear the residue of the bill, and make a final decree ? Such I think would hardly be the case.   On what ground are they to send it back to us ?   It is only necessary to state these queries, to show the novel position in which a Court below would be placed in its connexion with the Court above, if the legislature had not restrained appeals in the manner they have done, or have permitted them on every interlocutory motion.   Let us then view the question in any form we please, we are fully convinced that an appeal from the present decree is not allowed by law.

A suggestion was made by one of the counsel for the defendant, that we should allow the appeal *pro forma*, and, if it could not be sustained, the Supreme Court would dismiss it.   But we see no necessity for this, because either party has the right to order the cause down for a hearing on bill and answer; and before the next term of the Supreme Court arrives, we can pronounce a final

decree, when either party can have an appeal, and then the cause will be finally terminated.

From the power of appointing a receiver almost necessarily flows the right to order a sale of the property taken possession of by that officer. It is, however, a matter of discretion with the Court, whether they will or will not direct the receiver to proceed and make sale of partnership property. When, from the nature of the property in the custody of that officer, the Court are convinced it will best promote the interests of all the parties concerned, a sale is usually ordered. As, when the same are perishable articles, such as a large quantity of flour, which would injure by being kept, or fruit that would soon decay, or articles whose market value depends upon an immediate sale, to render them of much less value, or from any other reasonable cause which seems to require it: 1 Swanst. 529.

The property in this case is of a peculiar kind. The principal value of it consists in the subscription list and publication of a newspaper. This cannot be well carried on and conducted by a receiver. For him to cause it to be conducted by the defendant would not probably subserve the interests of the estate during a long-litigated suit in equity. The cause may be pending in this Court for some time yet; an appeal may be entered, and it carried to the Supreme Court. During its pendency the defendant would feel but little interest in trying to increase the subscription list, or in sustaining the literary character of the paper while the matter is involved in uncertainty, or when the probability is that it ultimately must be sold; on the contrary, he possibly might feel a disposition to detract from its elevated character. In short, we were of the opinion that this property was of so delicate and ephemeral a character, that a strict regard to justice demanded that it should be sold by the receiver; and such seems to have been the dealing of Courts of Equity with property of this description. The case of Marten v. Van Schaick, 4 Paige, 479, seems to be full to the point. It was a bill filed for the purpose of dissolving a partnership. A motion was made by plaintiff's counsel for the appointment of a receiver to take charge of the partnership effects, before answer or final hearing. It consisted of a printing establishment, and the subscription list and advertising custom of a public newspaper. This application was resisted on the ground that the principal value of the property consisted in the good-will of their business, which would be lost by the appointment of a receiver. The Chancellor, in delivering his opinion, remarks, " each partner has

an equal right in this case to the possession and control of the part-
nership effects and business, and if they cannot agree among them-
selves, it is a matter of course to appoint a receiver upon a bill filed
to close the partnership concerns, on the application of either party.
If a receiver is appointed, he must proceed and sell the establish-
ment without delay ; and in the mean time the business must be
carried on by him as usual, so that the good-will thereof may be
secured to the purchaser, and the full value of the establishment
realized by the partners on such sale.    But the Court will not take
upon itself the responsibility of continuing the publication of a
political paper by a receiver, any longer than is absolutely neces-
sary to prevent the sacrifice of the property." The Court referred
the matter to a Master, to appoint a receiver without delay.  Here,
then, we have the case of a receiver being appointed on motion, and
a sale ordered before a final decree.    It is difficult, it seems to me,
to distinguish the case now before us from the one just cited.    If
adjudicated cases are the land-marks of the law to guide our path,
we are only following in a well beaten track, which has been tra-
velled by the sages in the law who have gone before us.    The case
of Crawshay *v.* Maule, 1 Swanst. 527, already cited, goes further
than the Court have gone here, both as to the appointment of a
receiver and ordering a sale of the property.

When the order for the sale was made, no delay was asked by
the defendant, or proposition made to put the case down for a
hearing on bill and answer, so that a final decree might be speedily
given.    If the decree we have made, or the order given, injuriously
affects the interests of any one, we feel conscious that it does not
arise from any want of patience on our part, nor from the want of
a careful examination of every question decided ; and the opinions
given are based upon principles which we consider settled and
applied according to the best of our judgment.

If the parties could have amicably arranged a disposition of the
property, so that there should have been no sale of it until after a
final decree, in our opinion it would have been better for all concern-
ed.  An indulgence of three months was given by the Court, hoping
that some arrangement would be made ; our opinion on this sub-
ject was freely indicated, but every admonition in relation thereto
was unheeded, when, finally, an ultimate order upon the subject
was from a sense of duty imperatively forced upon us.    Therefore,
whatever may be its results, we have the consciousness of simply
doing that which was enjoined by the law, as the only way of ter-

minating an unpleasant controversy between the parties. The consequences rest with them, and not the Court.

After the foregoing opinion had been given, and the appeal refused, the sale was suspended until after a final hearing of the cause; the defendant giving a bond with sufficient sureties that, in the event of a sale, the property ordered to be sold should bring at least thirty thousand dollars, and in default thereof he would make good that sum in money.

The cause was then put down for argument before a full Court, on bill, answer, and proofs, and was heard at December Term, 1847, before Judges KING, PARSONS, and KELLEY.

The cause was argued by the same counsel for the plaintiffs, and the same for the defendant, who argued on the motion for an injunction and the appointment of a receiver.

The counsel on both sides discussed it upon nearly the same grounds: The main questions being, whether the good-will of the newspaper was partnership property, or whether it survived to M'Makin. And in the second place, even if it did not survive, whether he was bound to account for the profits made by him in the publication of the paper since the death of Holden. These questions were argued with great ability on both sides.

The unanimous opinion of the Court was on a subsequent day delivered by

KING, President.—The case disclosed by the bill, answer, and proofs, is substantially the following: Previous to the year 1836, a certain firm of Clark & Woodward were proprietors of a weekly literary journal, called "The Saturday Courier," published in Philadelphia, and patronized by about twenty-two thousand subscribers. Of this establishment, embracing the press, type, printing materials, subscription list, and outstanding debts, Andrew M'Makin, the defendant, and Ezra Holden, the plaintiffs' intestate, became the joint purchasers, at a sum of between twenty-four and twenty-five thousand dollars; each having purchased and paid for one-half. From that period until the death of Ezra Holden, on the 26th of March, 1846, the paper was edited and published by them, with singular success; the subscriptions amounting at the death of Holden to upwards of fifty-five thousand. At the death of Holden, the surviving partner, M'Makin, took the exclusive possession of the partnership effects, as by law he rightfully could do; and since that period he has continued the publication of the paper, furnish-

ing it as well to the subscribers existing at the death of Holden, as to others who have since become such.

It is not questioned that Mr. M'Makin, the surviving partner, is bound to account in this proceeding with the representatives of his deceased associate; as well with regard to the credits of the firm realized by him, as to all other partnership property in his possession. The subjects of difference between the parties arise thus: the plaintiffs insist, first, that they are jointly interested with the defendant, not simply in the press, types, and mechanical appliances of the Saturday Courier, but in the subscription list, good-will, and all other incidents attached to the establishment, by which its value is either produced or increased; and that, for the purpose of realizing most effectually this value, the Court is required to cause all these to be sold by the receiver, in whose custody they now are, and to order the avails of such sale to be credited to the joint estate; and, second, that, as the publication of the paper has been profitably conducted since the death of Mr. Holden with the joint property, the profits resulting therefrom, up to the time of the final taking of the account, should be credited to the joint estate. Both these positions have been strenuously resisted by the defendant, who insists that the subscription list, which he terms the good-will of the establishment, pertains to him exclusively, as surviving partner; and that no part of the establishment except the mechanical appliances of the paper belongs to the joint estate; and that, as a consequence of this position, the products of the business since the death of his co-partner, consisting of the profits made by him in supplying the paper to his own subscribers, at his own expense, cannot of right be brought into joint account.

These two questions are so intimately blended, that they may, for the sake of brevity and simplification, be considered together; for, if it is true, as the plaintiff contends, that the establishment, including the subscription list, continues as joint property, it follows that the surviving partner, having continued the partnership with the joint estate, is bound to account for the resulting profits to the extent which equity holds surviving partners accountable for profits made from continuing the former business with the joint capital.

That there exists no common-law right of survivorship among co-partners in trade, but that, on the death of any of the associates, *all* the joint property is divisible among the survivors and the representatives of the deceased associate, in the proportions in which

it was originally held, is an axiom of the law of partnerships. This doctrine, so consonant with right reason and natural equity, must apply to the interest of the deceased partner in the subscription list of any of our great modern journals, if such subscription list can either be the subject of specific property, or an incident and accessary of other and more tangible partnership estate, unless, as has been here contended, such a subscription list, under the name of good-will, contrary to the general genius of the law of partnership, pertains solely to surviving partners, to the exclusion of the representatives of a deceased associate.

The question of *fact*, whether the subscription list of the Saturday Courier is, or is not property, is readily answered from the admissions and proofs in the cause. For the large sum that was originally paid for the paper to Clark & Woodward, the great subscription list formed the chief consideration. Since the pendency of this controversy, the good-will and patronage of the establishment has been valued by appraisers, mutually chosen by the parties, at the sum of 60,000 dollars, in which sum the paper and type are not estimated. In order to arrest a sale of the establishment, including the subscription list, which had been directed by this Court under an interlocutory decree, the defendant has entered into bond with undoubted security, in the sum of thirty thousand dollars, conditioned that at any future sale thereof, it shall realize *at least* that sum. The mechanical appliances of the paper, independent of the subscription list, are not pretended to be worth much beyond three thousand dollars. So much for the proof of the value of the large subscription list to this public journal, drawn from the acts and concessions of the defendant in the cause. But, besides this, the plaintiffs have adduced the evidence of some of the leading publishers of newspapers and periodicals in the city, who unite in saying, that property in the subscription list of a public newspaper, or monthly or weekly periodical, is property known and understood as a thing separate and apart from the mere mechanical appliances of either; and that in point of fact, the editors and proprietors of them have often neither types nor presses; but employ practical printers to execute the mechanical part of the work. One of these witnesses gives us a most important fact, showing the value of a subscription to a public journal, as an article of property. He states that recently a sale has been made in this city of a newspaper establishment for *forty-five thousand dollars*, in which the presses, types, &c., were worth about three thousand dollars; the rest of this large sum being the value of the subscription list.

Facts could, doubtless, be readily multiplied, showing the existence and value of this new species of property, which has come into existence with the diffusion of education, the spread of intelligence, and the general advance of modern civilization. But this is unnecessary. For, if one fact can be absolutely truer than another, it is, that the subscription list of the Saturday Courier is a thing of real, actual, and practical value, for which in the public market. a sum may be obtained, greater than ordinarily crowns the exertions of a life of physical or intellectual toil.

If the Court were now dealing with the case of a dissolved partnership of this kind, where all the partners were living, its action, beyond dispute, would be such as is invoked by the plaintiffs here. We would order a sale of the whole establishment, and in that sale include the subscription list and every other matter or thing connected with the business, capable of transfer to a purchaser, and tending to increase the actual or speculative value of the thing sold. We would endeavour to make such a sale enure as advantageously for the common good, as the most complete sale made by consenting and according partners could do. In no other way could the partners receive equity at our hands, which would consist in putting all on a footing of the most perfect equality, securing to each his just portion of the value of the partnership property, whether that property consisted in things distinct and tangible, or of mere incidents and accessaries thereto.

The doctrine of the Court to this extent, we do not understand as resisted by our learned brethren who have conducted the argument for the defence. But they have endeavoured to satisfy us that the good-will of all partnerships, in the event of the death of one of the associates, pertains to the survivors; and that especially this is true in professional partnerships, to which they would assimilate the present —calling the subscription list of the *Courier* the good-will of the business—they then suppose their demonstration to be complete.

It is certainly necessary, in order to the efficacy of this argument, to show that the subscription list of a modern newspaper or periodical comes within the legal idea of the good-will of the business, before the legal question, whether the good-will belongs to survivors, or otherwise, can arise. For my own part, I doubt both the fact and the legal conclusion deduced from it. What is a good-will in the general and popular sense of the term? It is the right and privilege of continuing or conducting an old and established business, in an old and established place. And this was the nature of thing called

in Hammond v. Douglass, 5 Vesey, 239, *good-will*. It was the privilege and advantage retained by a surviving partner of continuing the sale of snuff in the place where himself and his deceased partner had established that business.    In Cuttwell v. Lye, 17 Vesey, 345, Lord Eldon calls a good-will " nothing more than the probability that old customers will resort to the old place." This was the nature of the good-will in Coslake v. Till, 1 Russell, 376, which arose under a contract for a sale of a tavern.    Harrison v. Gardner, 2 Maddock's Reps. 444, was the case of a transfer by one partner to another of the good-will of a cheesemonger's shop, where a retail trade was carried on in a populous neighbourhood.    " A person not a lawyer," says the Vice-Chancellor in that case, " would not imagine that when the good-will of a retail shop was sold, the vendor might the next day set up a shop within a few doors and withdraw all the customers.    The good-will of such a shop, in good faith and honest understanding, must mean all the benfiet of which the vendor might next day deprive the vendee." So far the judicial idea of a good-will agrees with the general and popular signification of the phrase, which simply means *patronage*.    When a party, on selling a good-will, has stipulated expressly not to conduct or carry on, the same trade or business at all, or not within a given distance, the contract has been called by text-writers a second species of good-will.    The cases of Bryan v. Whitehead, 7 Simons, 74, Harrison v. Gardner, 2 Madd. 498, and Kennedy v. Lee, 3 Meriv. 452, are the cases ordinarily cited as establishing the existence of this second species of good-will.    But in truth they only refer to the ordinary cases of the sale of good-will, accompanied with restrictions and qualifications which might not otherwise have existed in the case of a simple transfer of a good-will without further stipulation in the contract of sale.    The vague and undefined and undefinable value of the opportunity of carrying on the trade of a co-partnership in an accustomed place, may have led Courts to doubt as to the propriety of bringing it into account as an item of partnership property in closing up the concerns of a partnership terminated by the death of one of the co-partners, and have produced an apparent vacillation in the decisions on the subject.    But in not one of the adjudicated cases does the thing talked of as a good-will bear any analogy in value and quality to the subscription list of a public journal, spreading over a nation, and obtained by the labour and expense of agents, and the toil and trouble necessarily employed and encountered in such an undertaking.    When such a subscription list is obtained by associated partners, as here, originally by the

payment of a large sum of money, and afterwards increased by personal exertions; where, as here, it is rendered the source of increased emolument, by the partners supplying their patrons with their journal worked on their own presses, by their own types; certainly such a subscription list must be regarded as property, either as distinct and separate from their mechanical manipulations, or as incident and accessary thereto.   In M'Farlan v. Stewart, 2 Watts, 111, the subscription list of a public journal was held *at law* to pass to a purchaser of the printing materials at a sheriff's sale, as incident and accessary to the purchase of the establishment. If, then, as this case decides, the subscription list of a public journal is so united to the establishment as to pass with the printing materials in a sheriff's sale; then surely, after the death of one of several partners in such journal, the subscription list remains as much attached to his portion of the joint printing materials as to that of the survivors; and can on no principle of equity or justice be separated from them, to the injury of the representatives, and for the exclusive benefit of the survivors.   It is a thing which belongs to the common property, and which, if detached from it, renders it comparatively worthless.   If a Court of Law would so regard it for the benefit of a purchaser at sheriff's sale, would not a Court of Equity, in administering the estate of a deceased partner, consider it as a thing equally inseparable from the common property; and regard the entirety made up of the presses, types, printing materials, and subscriptions, as forming the printing and publishing establishment, and appropriate it accordingly ?

If, therefore, the authorities on the subject of the survivorship of the good-will of partnership concerns were in harmony with each other, and concurred in giving what is called the good-will to the surviving partners, we could not see our way clear to consider the subscription list of this great public journal as coming within the legitimate idea of a *mere good-will*.   But the authorities are not in such harmony.   The weight of them is against the doctrine of survivorship, as we think most conclusively shown by Judge Parsons, in his opinion delivered on the motion for an injunction, in which we entirely concur.   The case of Hammond v. Douglass, from which the whole doctrine springs of the accession by survivorship to partnership good-wills, is there shown neither to be well founded in principle, nor sustained by the subsequent English and American authorities.   On the contrary, the better opinion at this time is, that partnership good-wills do not survive, but remain part of the joint estate.

2 C

The case of professional partnerships between lawyers and physicians, in which it has been held that no such thing as partnership good-will exists, have no relevancy to a case like this. The business of such concerns is purely personal. It arises from the public confidence given to the associates individually, and which terminates with themselves. It is not from its nature transferable, and it would be utterly impracticable to define any standard by which we could estimate how much professional advantage the surviving partner in such a concern gained in virtue of having such. If he was able and efficient, he might gain much, if otherwise nothing. And even where he possessed capacity to retain the business, it would be difficult to estimate how much of the associated business he retained by virtue of his survivorship, and how much by force of public confidence existing in him personally. These and other difficulties in indicating any standard of computation of the value of good-wills in such cases, naturally and properly led Courts to reject all idea of anything like good-will existing in professional partnerships. But the sober realities of this case, show that no such practical difficulties exist in estimating the value of the subscription list of the Saturday Courier. It is as easily arrived at, as the value of either of the presses, or founts of type, belonging to the concern. Let it be exposed with them to public sale, and the sagacity of personal interest will immediately demonstrate that such a subscription list is not a visionary and intangible essence, but a most valuable and eagerly sought-after entity. Were it otherwise, the earnest and commendable professional zeal displayed throughout this well contested cause, would never have had existence.

We are without judicial precedents of cases arising under what has been termed in the defendant's argument literary partnerships. This partnership has certainly some claim to that character. The principles, however, on which questions of this kind, arising in literary associations, ought to be settled, would vary according to the nature of the association itself. Where it was purely literary, such as that which produced to English literature the dramas of Beaumont and Fletcher; the association being personal, would expire for all purposes of futurity with the death of either associate. And the doctrine which regulates professional partnerships, and repudiates the existence of anything like good-will existing in them, would be applied. In the case, however, of a *quasi* literary partnership like this, when a great portion of the matter in the journal is composed of selections from other journals and standard works;

contributions gratuitously furnished by authors, or paid for to them by the owners of the journal; of advertisements, and the usual melange which fills up a modern newspaper; the rule must clearly be a different one. The editing and conducting such a paper, particularly when it is accompanied with the mechanical execution of it, is a business requiring intelligence certainly, but not such as is exclusively possessed by the existing proprietors of any of these establishments.

Holden & M'Makin succeeded Woodward & Clark in conducting a highly popular public journal, and not only satisfied the old subscribers, but doubled them. And if this decree results in the sale of this establishment, we do not doubt, that many could be found who will minister to the public taste in the publication of this journal as successfully as its late popular proprietors. The publication, therefore, of a newspaper, in our opinion, stands on the same footing as any other of the various pursuits of life which require education and intelligence; and the citizen who engages in them, has the same interest guarantied to him by the laws when acting with others, as if it was a pursuit purely mechanical or mercantile.

If, therefore, the subscription list is, according to the defendant's argument, the good-will of the establishment of the Saturday Courier, and if the distinction we have taken between it and good-will properly so called, cannot be sustained; still it is not such a good-will as survives to the surviving partner, but belongs to, or is to be administered as part of the joint estate.

> The final result of our opinion therefore is, that the subscription list of the Saturday Courier was and is part and parcel of the joint estate of the late co-partnership of Holden & M'Makin; and that the same must be exposed to public sale by the receiver, at the time of the sale of the presses, types, and mechanical appliances of the Saturday Courier; the proceeds, when received, to be credited to the account of the joint estate; and that, inasmuch as the defendant has conducted and carried on the publication of the Saturday Courier since the death of Ezra Holden, with the joint estate of the late firm, all profits resulting from the same of law and right pertain to the said joint estate, and must be accounted for accordingly. In taking such account, the Master to whom the same shall be referred will make Mr. M'Makin such allowance for the conducting and management of the paper since the death of Mr. Holden, as shall seem to him just and proper.